69-08/EEL
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff
SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD.
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Eric E. Lenck (EL4547)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x
SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD

                                           Plaintiff,

                    - against -

TRANS POWER CO., LTD.

                                           Defendant.
-----------------------------------------------------------------x

**08-CV- 1562 (RMB)**


**AMENDED VERIFIED
COMPLAINT**


        Plaintiff, SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD (hereinafter "Plaintiff"

or "San Juan"), by its attorneys Freehill, Hogan & Mahar, LLP, as and for its Amended Verified

Complaint against the Defendant TRANS POWER CO., LTD. (hereinafter "Trans Power"),

alleges upon information and belief as follows:

        1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the

Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract

of charter party. This case also falls under this Court's admiralty and maritime jurisdiction

pursuant to 28 U.S.C. §1333, and the Court's federal question jurisdiction pursuant to 28 U.S.C.

§1331. Federal jurisdiction also exists because the action arises under the New York Convention

on the Recognition and Enforcement of Foreign Arbitral Awards at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2.     At all times relevant hereto, the Plaintiff San Juan was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 10 Anson Road # 35-09A International Plaza, Singapore 079903.

3.     At all times relevant hereto, the Defendant Trans Power was and still is a foreign business entity duly organized and existing under the laws of Mauritius with an office and place of business at 26A, 99 LuJiang Avenue, Xiamen, 361001, China, but no office or presence within this District.

4.     On or about June 13, 2007 Plaintiff San Juan entered into a maritime contract of charter party with disponent owner Hanjin Shipping Co. Ltd. to charter the M/V FANY for a period from June 20, 2007 until min 30 November 2007 or January 30, 2008 in charterer's option.

5.     On or about January 8, 2008 Plaintiff San Juan, in the capacity as a time charterer of the M/V FANY, sub-chartered the M/V FANY under a maritime contract of charter party with Defendant Trans Power under which Defendant Trans Power agreed to charter the vessel on a trip time charter for a duration of about 25 days for the carriage of a cargo of nickel ore in bulk to be loaded in Waigeo, Indonesia and discharged at Yangpu, China. A copy of the fixture recap and pro forma charter party is annexed hereto as Exhibit A and incorporated herein by reference.

6.     The subject fixture recap provided, *inter alia*, that the Defendant charterer would only employ the vessel between safe ports, safe berths and safe anchorages and that it would be governed and construed according to English Law.

7.    Pursuant to the terms of the charter, Plaintiff San Juan tendered the M/V FANY into the service of Defendant Trans Power on January 8, 2008 at Singapore and the vessel commenced trading under the subject charter, proceeding to Waigeo to commence loading.

8.    On or about January 15, 2008, the jib and the grab of the vessel's No. 3 crane sustained serious damage, which damage was reportedly caused by stevedore negligence and/or a breach of the safe berth/safe anchorage warranty in the charter party.  Head owners Hanjin have already indicated their intention to pursue a claim for this damage.  It is estimated that repairs to the jib will take 10.5 days at a cost of $51,580 and that the cost of repairing or replacing the grab for the no. 3 crane will be $53,000.

9.    Repairs to the jib of the No. 3 crane are scheduled to take place at Shenzhen after completion of discharge and sailing time from the discharge port of Yangpu to Shenzhen is estimated at 1.62 days, which will consume another $63,180 in hire.

10.    Rider Clause 46 of the charter party provides that if damages are caused to the vessel or its fittings by the charterers or their stevedores, which damages affect the vessel's seaworthiness or the proper working of the vessel and/or her equipment, said damages shall be repaired without delay, "…in the Charterers' time, risk and shall be paid for by the Charterers before sailing from the port."  Under Rider Clause 46 the Charterers further undertake to reimburse the expense of repairs of damages which do not affect the vessel's seaworthiness or proper working of the vessel and/or her equipment.

11.    The damages sustained by the jib and the grab of the No. 3 crane affect the proper working of the vessel and/or its equipment.  The jib has already had to be removed.

12.    During the course of the loading of nickel ore from barges at the Waigeo anchorage, the hull of he M/V FANY has sustained damages, due to the operation of the barges

by the loading stevedores without sufficient fenders. These damages will ultimately require repair.

13.    During the course of the loading operation the vessel and its equipment have sustained various damages due to stevedore negligence and/or a breach of the safe berth/safe anchorage warranty in the charter party.  The additional damages include, but are not limited to: damages to the grabs of the Nos. 2 and 4 cranes; damage to the No. 4 crane; damage to the vessel's handrail on deck; a broken cable junction box; damage to four meters of pipe of the cable junction box; a dent in the after part of the hatch cover; and extensive shell plate damage. All of these affect the proper working of the vessel and/or its equipment.  These damages will ultimately require repair.

14.    Under the charter party between Plaintiff San Juan and Defendant Trans Power dated January 8, 2008 the vessel was chartered for a period/trip which Trans Power represented would have a duration of "about 25 days." The vessel has already been on charter for 36 days and still has not arrived at the discharge port. It is currently estimated that the vessel will be redelivered 19 days beyond the represented duration of the charter party of February 2, 2008. Due to the late redelivery of the vessel, Plaintiff San Juan is suffering damages estimated at $5,000 per day, based on the differential between the rate of hire under the San Juan / Trans Power charter party and the current market rate for the vessel.

15.    The Fixture Recap (Exhibit A) provides for daily hire of US$39,000.00, payable every 15 days in advance. Calculating hire due up to an including February 14, 2008 at 13:42 hours, Trans Power has failed to pay hire due in the amount of $556,450.80.

16.    An additional advance payment of $260,549.00 pursuant to Clause 5 of Exhibit A was due to be paid by close of business on February 14, 2008.  Despite a promise to pay part of

this amount and a belated and vague suggestion to establish an escrow to serve as security for the unpaid hire, Trans Power has failed to pay the $260,549.00 and has failed to provide any security to Plaintiff San Juan.  These damages are in addition to the charter hire damages set forth in Plaintiff San Juan's original Verified Complaint dated February 14, 2008.

17.    As a consequence of Trans Power's breaches of the charter party, San Juan has suffered or will suffer extensive damages.

18.    The damages suffered by Owners as nearly as can be estimated at this time, include the following items:

| | |
|---|---|
| A. Estimated cost of repairs to the jib of the No. 3 crane | $    51,580.00 |
| B.  Estimated cost of repairing/replacing the grab of the No. 3 crane | $    53,000.00 |
| C. Estimated time lost to the repair of the jib of the No. 3 Crane – 10.5 days x US$39,000  less commission | $  389,025.00 |
| D. Estimated streaming time from port of discharge, Yangpu, to Shenzhen to repair No. 3 crane – 1.62 days x $39,000 per day | $    63,180.00 |
| E. Estimated damages due to the late redelivery of the M/V FANY, 19 days x $5,000 per day differential between charter party rate Of hire and the market rate for the vessel | $    95,000.00 |
| F. Outstanding hire up to and including February 14, 2008 at 13:42 hours | $  556,450.80 |
| G. Surveyors' Fees | $      5,269.73 |
| H. Advance hire due on February 14, 2008 | $  260,549.00 |
| Sub Total | $1,474,054.53 |

Plaintiff expects to incur additional losses relating to the vessel damages described in Paragraph 13 above, although the amount of such damages has not yet been determined.

19      The charter party provides that it is to be governed by English law and all disputes between the parties are to be resolved by arbitration in London. Plaintiff San Juan specifically reserves its right to arbitrate the substantive matters at issue in London arbitration.

20.     This action is brought to obtain security in favor of Plaintiff San Juan for its claims against Defendant Trans Power in aid of London arbitration proceedings and to obtain jurisdiction over Trans Power for enforcement purposes.

21.     This action is further brought to obtain security for any additional sums to cover Plaintiff's anticipated attorney fees and costs in the arbitration and interest, all of which are recoverable as part of Plaintiff's claim under English law.

22.     Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs, including attorney fees, arbitrators' fees, disbursements, and interest are recoverable as an element of Plaintiff's claim.

23.     Plaintiff San Juan's anticipated recoverable attorney fees and costs in the arbitration are estimated to be $475,000.00.

24.     Plaintiff San Juan's interest recovery in the London Arbitration is estimated at $287,440.62 based on a rate of 6.5 % p.a. for a period of 3 years.

25.     Upon information and belief, and after investigation, Defendant Trans Power cannot be "found" within this district for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising of, *inter alia*, cash, funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant (hereinafter, "ASSETS"), moving through banking institutions and/or such other garnishees who may be

served with a copy of the Process of Maritime Attachment and Garnishment issued herein, with

the total amount to be attached being $2,236,495.15, based on the following:

| | |
|---|---|
| San Juan damages (Para. 18) | $1,474,054.53 |
| London arbitration attorney fees and costs (Para. 23) | $ 475,000.00 |
| Interest (Para. 24) | $ 287,440.62 |
| **Total** | **$2,236,495.15** |

WHEREFORE, Plaintiff San Juan prays:

a. That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged;

b. That since Defendant cannot be found within this District pursuant to Supplemental Rule B, all tangible or intangible property of the Defendant, up to and including the sum of $2,236,495.15 be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, debts, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant Trans Power (as identified herein) moving through or within the banking institutions and/or any other institutions or any garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein; and

c. That this Court enter an order directing and compelling the defendant to appear and defend in the arbitration;

8

d.     That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary, including enforcement of the award and entry of judgment thereon; and,

e.     For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
       February 15, 2008

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff

By:                                     
      Eric E. Lenck (EL4547)
      80 Pine Street
      New York, NY 10005
      (212) 425-1900
      (212) 425-1901 fax

## ATTORNEY VERIFICATION

State of New York   )
                  ) ss.:
County of New York )

ERIC E. LENCK, being duly sworn, deposes and says as follows:

1.     I am a partner with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2.     The sources of my information and the grounds for my belief are communications, information and documentation provided by our client through their English solicitors.

3.     The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

Eric E. Lenck

Sworn to before me this
15th day of February, 2008

Notary Public

JOAN SORRENTINO
Notary Public, State of New York
No. 01SO6067227
Qualified in New York County
Commission Expires December 3, 2009

NYDOCS1/299179.1

# EXHIBIT A

## Jenny Gao

| | |
|---|---|
| From: | JIAMING ZHANG [hmax@auseashipping.com] |
| Sent: | Tuesday, January 08, 2008 5:05 PM |
| To: | sjn@sjnav.com.sg |
| Subject: | MV FANY / TRANSPOWER CLEAN RECAP |

=================================================================

From: Au-Sea Shipping Ltd
Tel: +86 10 6409 6566 Fax: +86 10 6409 6255
RefNum: JZ17329012
Date: 1/8/2008 5:04:36 PM
=================================================================

FREDERIK / JIAMING

MV FANY / TRANSPOWER

as per telcon , we fix clean as foll:- cp dd 8th jan 2008

++ALL NEGOTIATIONS AND ANY SUBSEQUENT FIXTURE ARE TO BE STRICTLY
PRIVATE AND
CONFIDENTIAL, NOT TO BE REPORTED TO ANY THIRD PARTY AND IS NOT TO
FEATURE IN
ANY FIXTURE LISTS OR MARKET REPORTS++


MV "FANY" FLAG Korean BLT 1994 Bulk Carrier
++ALL DETAILS ABOUT WOG++
43,598MT SDWT on 11.319M SSW - TPC 49.6
GRT/NRT 25,895/13,673
LOA/BEAM 185.84M/30.40 M
5HO/5HA · 4X30MT CRANES + 4 x 12CBM GRABS
1,892,666 FT3 GRAIN/1,846,261 FT3 BALE
Speed/Consumption basis good weather conditions of upto Beaufort Force
4
and Douglas Sea State 3 and no negative influence by swell/adverse
currents:
AVG ABT 13.0K(L)/13.5K(B) ON ABT 27.5 MT IFO 380 CST plus 0.50 MT MDO
Port idle: about 2.5/3.0 M.T. IFO plus 0.3 MT MDO
·Port Working per 24 hours - about 3.7/4.5 M.T. IFO plus 0.3 MT MDO
Vessel burns MDO in main engine when maneuvering and when
entering/leaving.
port and in restricted waters or in restricted visibility.


FOR


-A/C TRANSPOWER
-DELY DLOSP SINGAPORE ATDNSHINC
-LAYCAN 8-11 JAN 2008
-1 TCT ALWAYS VIA SPS SBS SAS AA AWIWL WITH NICKEL ORE IN BULK VIA

1

INDONESIA TO CHINA.
 Charterers warrant that the nickel ore cargo will be
loaded/stowed/carried and discharged in strict conformity with I.M.O.
and local regulations and BC Code
- DUR - abt 25 days(singapore-waigeo-yangpu: 6 days ballast + 6-7 days
loading - 6 days laden + 3 days discharging)
-HIRE USD 39,000 DAILY INCLOT PAYABLE EVERY 15 DAYS IN ADVANCE
-REDELY DLOSP 1SP CHINA PICO ATDNSHINC
-BUNKER CLAUSE
Vessel to be delivered with bunkers as on board est to be  1200-1300
Mt IFO and  125  Mt MDO Charterers to pay for estimated consumption
for the trip ie: abt 350 Mt IFO and 10 Mt MDO together with first
hire
payment. Vessel to be redelivered to owners with bunkers remaining
on board without replenishment by charterers. Bunker prices pmt
usd$530/850 ifo/mdo respectively.  (bod must be sufficient to perform
charterers' intended voyage)
-CHOPT TO REDEL VSL WITH UNCLEAN HOLDS, PAYING L/S USD 5000 IN
LIEU OF SUCH CLEANING
 CGO HOLD CLEANLINESS ON DELY- AS PER OWS B-T-B C/P WORDING
-CHTRS TO PAY OWNRS USD 1,300 PER MONTH OR PRO RATA FOR
CABLE/ENTERTAINMENT/VICTUALLING
-ON-HIRE AND OFF-HIRE SURVEYS - AS PER OWS BTB WORDING.
-GA/ARBITRATION IF ANY, TO BE IN LONDON AND ENGLISH LAW TO APPLY
-IF ORIGINAL BS/L NOT AVAILABLE UPON VSL ARRIVAL DISPORT, THEN
OWNERS/MASTER AGREE TO DISCHARGE AND RELEASE ENTIRE CARGO
AGAINST CHARTS SINGLE STAMPED/SIGNED LOI (NO BANK GUARANTEE
AND SIGNATURE) IN OWNERS PNI CLUB WORDING  ON CHTRS' LETTERHEAD
SIGNED BY CHTRS' AUTHORIZED SIGNATORY ONLY
- 3.75 PCT ADDRS + 1.25% TO AUSEA SHIPPING = 5% TTL COMM

OTHERWISE AS PER OWS BTB CP MV FANY /SAN JUAN NAVIGATION CP WITH
LOGICAL AMENDMENT EXCEPT FOLL ALTERATIONS :-


Main body:

1) line 53:delete "including pilotage in bosporus ...... magellan
strait"
2) line 86: delete "25"

Riders:

1) clause 53: owners confirm followings:
add: "vessel/master/crew to fully comply with current trading
regulations including immigration"
2) clause 54, paragraph 2, line 2: delete "and plus/minus 5(five)
percent respectively"
5) clause 64, delete "intermediate hold cleaning .... such substances"
6) clause 93, delete and replace with "No dry-dock in this charter
unless emergency"


BRGDS,

2

AUSEA

# Time Charter

GOVERNMENT FORM
Approved by the New York Produce Exchange
November 6th, 1913-Amended October 20th, 1921 ; August 6th, 1931 ; October 3rd, 1946

1. *This Charter Party*, made and concluded in.................... day of  19....................
2. B e t w e e n ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ... ...
3. Owners of the good........*Korea flag*.......Steamship/Motorship .....*M.V. "FANY"* ..............................of...........
4. ~~of.................tons gross register, and.................tons net register, having engines of .................indicated horse~~
5. ~~power and with hull, machinery and equipment in a thoroughly efficient state, and classed.............at.............of~~
6. ~~about.................cubic feet bale capacity, and about ................n tons of 2240 lbs. deadweight capacity (cargo~~
7. ~~and bunkers, including fresh water and stores not exceeding one and one-half tons of ship's deadweight capacity,~~
8. ~~allowing a minimum of fifty tons) on a draft of.......feet...inches on.................summer freeboard, inclusive of~~
9. ~~permanent bunkers, which are of the capacity of about ............tons of fuel, and capable of steaming, fully laden,~~
10. ~~under good weather conditions .....about........knots on a consumption of about .............tons of best Welsh~~
11. ~~coal best grade fuel oil best grade Diesel oil,~~ *See Clause 53 for further descriptions.*
12. now...... *trading.* .........................................................................................................................
13. and.... *HANJIN SHIPPING CO., LTD.*.................Charterers of the City of ........... *Seoul, Korea.*..............
14.      Witnesseth, That the said Owners agree to let, and the said Charterers agree to hire the said vessel, from the
15. time of delivery, for ~~about minimum~~  *months upto about  months (about means +15days in Charterers option)*
16. *period charter trading via safe port(s), safe berth(s), safe anchorage(s), always afloat, always accessible, always*
17. *within Institute Warranty Limits with lawfull/harmless cargoes* .............*within below mentioned trading limits.*
    *Charterers not to trade vessel breaking Institute Warranty Limits unless Owners' prior consents obtained which*
    *not to be unreasonably withheld. Charterers to pay additional premium for breaking Institute Warranty Limits*
    *against copy of original vouchers but always max as per Lloyds of London scale.*
18. Charterers to have liberty to sublet the vessel for all or any part of the time covered by this Charter, but Charterers
19. remaining responsible for the fulfillment of this Charter Party.
20. Vessel to be placed at the disposal of the Charterers, ~~at~~ *on dropping last outward sea pilot one safe port Singapore/*
21. *Japan range port in Owners' option, at any time day or night Sundays and holidays included*
22. .................................................................................................................................................
23. .................................................................................................................................................
24. .................................................................................................................................................
25. .................................................................................................................................................
26. ~~in such dock or at such wharf or place (where she may safely lie, always afloat, at all times of tide, except as~~
27. ~~otherwise provided in clause No. 6), as the Charterers may direct. If such dock, wharf or place be not available time~~
28. ~~to count as provided for in clause No. 5.~~ Vessel on her delivery to be ready to receive *any permissible* cargo with
29. clean-swept holds and tight, staunch, strong and in every way fitted for the *ordinary cargo* service, having water
30. ballast, winches and donkey boiler with sufficient steam power, or if not equipped with donkey boiler, then other
31. power sufficient to run all the *cranes* ~~winches~~ at one and the same time(and with full complement of officers,seamen,
32. engineers ~~and firemen~~ for a vessel of her tonnage), to be employed, in carrying lawful merchandise, ~~including~~
33. ~~petroleum or its products, in proper containers,~~ excluding........... *See Clause 41.*........................................
34. ~~(vessel is not to be employed in the carriage of Live Stock, but Charterers are to have the privilege of shipping a~~
35. ~~small number on deck at their risk, all necessary fittings and other requirements to be for account of Charterers), in~~
36. ~~such lawful trades, between safe port and/or ports in British North America, and/or United States of America, and/or~~
37. ~~West Indies, and/or Central America, and/or Caribbean Sea, and/or Gulf of Mexico, and/or Mexico, and/or South~~
38. ~~America~~.............. *world wide trade always via safe port(s), safe berth(s), safe anchorage(s), always afloat,*
39. *always accessible, always within IWL - See Clause 40.*....................~~and/or Europe and/or Africa, and/or Asia,~~
40. ~~and/or Australia, and/or Tasmania, and/or New Zealand, but excluding Magdalena River, and/or~~ *See Clause 40.*
41. ~~between October 31st and May 15th, Hudson Bay and all unsafe ports; also excluding, when out of season, White Sea,~~
42. ~~Black Sea and the Baltic.~~
43. .................................................................................................................................................
44. .................................................................................................................................................
45. .................................................................................................................................................
46. as the Charterers or their Agents shall direct, on the following condition:
47.     1. That the Owners shall provide and pay for all provisions, wages, and consular shipping and discharging
48. fees *actual expenses incurred, including but not limited to additional agency fee charged by agents for performing*
49. *crew/owners' matter* of the Crew; shall pay for the insurance of the vessel, also for all the cabin, deck, engine-room
50. and other necessary stores, including boiler water, *drinking water and lubricant oil and garbage disposal* and
    maintain her class and keep the vessel in a thoroughly efficient

51. state in hull, machinery and equipment for and during the service.
52.    2. That *whilst on hire* the Charterers shall provide and pay for all the fuel except as otherwise agreed, Port
53. Charges, *customary and/or recommended* Pilotages *including pilotage in Bosporus and Charterers will pay*
54. *customary case and pilot requested by Master including in Dardanelles and Great Belt, Magellan Strait,* Agencies,
55. *Canal tolls,* Commissions, Consular Charges (except those pertaining to the Crew), and all other usual expenses
56. except those before stated, but when the vessel puts into a port for causes for which vessel is responsible, then all
57. such charges incurred shall be paid by the Owners.
58. Fumigations ordered because of illness of the crew *or cargoes carried prior to delivery* to be for Owners account.
59. Fumigations ordered because of cargoes carried *after delivery and or cargoes intended to be carried* or ports visited
while vessel is
60. employed under this charter to be for Charterers account. ~~All other fumigations to be for Charterers account after~~
61. ~~vessel has been on charter for a continuous period of six months or more.~~
62.    Charterers to provide necessary dunnage, *lashing material,* and shifting boards, also any extra fittings
63. requisite for a special trade or unusual cargo, but Owners to allow them the use of any dunnage and shifting boards
64. already aboard vessel . Charterers to have the privilege of using shifting boards for dunnage, they making good any
65. damage thereto.
66.    3. That the Charterers, at the port of delivery, and the Owners, at the port of re-delivery, shall take over and
67. pay for all fuel remaining on board the vessel ~~at the current prices in the respective ports. the vessel to be delivered~~
68. ~~with not less than ................................tons and not more than................tons and to be re-delivered with not~~
69. ~~less than ........................tons and not more than ................................tons.~~ *See Clause 62.*
70.    4. That the Charterers shall pay for the use and hire of the said Vessel at the rate of...*USD*       *daily*
71. *including overtime, payable 15days in advance to Owners* nominated bank............~~United States Currency per~~
72. ~~ton on vessel's total deadweight carrying capacity, including bunkers and stores, on...............summer freeboard,~~
73. ~~per Calendar Month,~~ commencing on and from the *time* day of her delivery, as aforesaid, and at and after the same
74. rate for any part of a *day* ~~month;~~ hire to continue until the *time* ~~hour~~ of the day of her re-delivery *GMT to apply both*
75. ends in like good order and condition, ordinary wear and tear excepted, to the Owners (unless lost)
76. ~~at~~ *on* dropping last outward last one safe port one safe port Aden/Japan range including Indonesia, Thailand, People's
77. *Republic of China, Philippines (incase of Persian Gulf, to be passing Muscat outbound), Boston/Bahia Blanca*
78. *range (including Caribeans / north coast South America / USG), Vancouver / Valparaiso range, Skaw/Cape*
79. *Passero range (including Mediterranean sea / Black sea), Cape Town/Mombasa range Port in Charterers option,*
80. *at any time day or night Sundays and holidays included.*
81. .............................................................................................................................
82. .............................................................................................................................
83. .............................................................................................................................
84. .............................................................................................................................
85. .............................................................................................................................
86. unless otherwise mutually agreed. Charterers are to give Owners not less than...*25* ...days *followed by 20/15/10/7*
87. *days notice of approximate redelivery date and intended port thereafter 5/3/2/1 days definite notice of redelivery*
88. *date and port* ~~notice of vessels expected date of redelivery, and probable port.~~
89.    5. Payment of said hire to be made *as per Clause 61* ~~in New York~~ in cash *to Owners' nominated account* in
90. United States Currency, ~~semi-monthly~~ *every 15 days* in advance, and for the last half month or part of same the
91. approximate amount of hire, and should same not cover the actual time, hire is to be paid for the balance day by day,
92. as it becomes due, if so required by Owners, unless bank guarantee or deposit is made by the Charterers, otherwise
93. failing the punctual *upto expected redelivery time/date* and regular payment of the hire, or bank guarantee *or deposit,*
94. or on any breach of this Charter Party, the Owners shall be at liberty to withdraw the vessel from the service of the
95. Charterers, without prejudice to any claim they (the Owners) may otherwise have on the Charterers. ~~Time to count~~
96. ~~from 7 a.m. on the working day following that on which written notice of readiness has been given to Charterers or~~
97. ~~their Agents before 4 p.m., but if required by Charterers, they to have the privilege of using vessel at once, such time~~
98. ~~used to count as hire.~~
99.    Cash for vessel's ordinary disbursements at any port may be advanced as required by the Captain, *and/or*
100. *Owners* by the Charterers or their Agents, subject to 2 1/2% commission and such advances shall be deducted from
101. the hire. The Charterers, however, shall in no way be responsible for the application of such advances.
102.    6. That the cargo or cargoes be laden and/or discharged in any *safe* dock or at any *safe* wharf ~~or place~~ *in safe*
103. *port or elsewhere or safe place in safe port or elsewhere* that Charterers or their Agents may direct, provided the
104. vessel can safely lie always afloat at any time of tide, *NAABSA to apply at Argentina/Brazil/Colombia.*
105. *See Clause 39* ~~except at such places~~ *provided* where it is customary for similar size vessels to safely lie aground.
106.    7. That the whole reach of the Vessel's Hold, ~~Decks,~~ and usual places of loading (not more than she can
107. reasonably stow and carry), also accommodations for Supercargo, if carried, shall be at the Charterers' disposal,
108. reserving only proper and sufficient space for Ship's officers, crew, tackle, apparel, furniture, provisions, stores and
109. fuel. ~~Charterers have the privilege of passengers as far as accommodations allow, Charterers paying Owners........per~~

110. ~~day per passenger for accommodations and meals. However, it is agreed that in case any fines or extra expenses are~~
111. ~~incurred in the consequences of the carriage of passengers, Charterers are to bear such risk and expense.~~
112.     8. That the Captain shall prosecute his voyages with the utmost despatch, and shall render all customary
113. assistance with ship's crew and boats. The Captain (although appointed by the Owners), shall be under the orders and
114. directions of the Charterers as regards *vessels* employment and agency ; and Charterers are to load, stow, and trim,
115. *secure tally and discharge and lash/unlash and dunnage*   the cargo at their expense under the supervision of the
116. Captain, who is to sign Bills of Lading for cargo as presented, *strictly* in conformity with Mate's or Tally Clerk's
117. receipts.
118.     9. That if the Charterers shall have reason to be dissatisfied with the conduct of the Captain, Officers, or
119. Engineers, the Owners shall on receiving particulars of the complaint, investigate the same, and, if necessary, make a
120. change in the appointments.
121.     10. That the Charterers shall have permission to appoint a Supercargo, who shall accompany the vessel *at his*
122. *own risk and standard L.O.I to be signed and lodged with Master on his boarding* and see that voyages are
123. prosecuted with the utmost despatch. He is to be furnished with free *and suitable* accommodation, and same fare as
124. provided for Captain's table, Charterers paying at the rate of ~~$1.00~~ *$10.00* per day. Owners to victual Pilots and
125. Customs Officers, and also, when authorized by Charterers or their Agents, to victual Tally Clerks, Stevedore's
126. Foreman, etc., Charterers paying *USD5.00* ~~at the current rate~~ per meal, for all such for victualling *all charges for*
127. *bonded stores consumed to be paid extra by Charterers at actual costs as billed by master.*
128.     11. That the Charterers shall furnish the Captain from time to time with all requisite instructions and sailing
129. directions, in writing, and the Captain shall keep a full and correct Log of the voyage or voyages, which are to be
130. patent to the Charterers or their Agents, and furnish the Charterers, their Agents or Supercargo, when required, with a
131. true copy of daily ~~Logs~~ *deck and engine Logs in English*, showing the course of the vessel and distance run and the
132. consumption of fuel.
133.     12. That the Captain shall use diligence in caring for the ventilation of the cargo. *Vessel has natural*
134. *ventilation only.*
135.     13. ~~That the Charterers shall have the option of continuing this charter for a further period of.....................~~
136. ~~...................................................................................................................................~~
137. ~~on giving written notice thereof to the Owners or their Agents ..................days previous to the expiration of the~~
138. ~~first-named term, or any declared option.~~
139.     14. That if required by Charterers, time not to commence before
140. ........and should vessel not have ~~given written notice of readiness~~ *been delivered* on or before.......................
141. .....~~but not later than 4 p.m.~~ Charterers or their Agents to have the
142. option of cancelling this Charter at any time not later than the day of vessel's readiness. *See Clause 60.*
143. .............................................................................................................................................................
144. .............................................................................................................................................................
145.     15. That in the event of the loss of time from deficiency, *and/or default of officers /crew or deficiency* of men
146. or stores, fire, breakdown or damages to hull, and machinery or equipment, grounding, detention by average
147. accidents to ship or cargo, drydocking for the purpose of examination or painting bottom or by any other cause
148. *whatsoever for which Owners are found liable under terms of this Charter Party and unless caused by Charterers*
149. preventing the full working of the vessel, the payment of hire shall cease for the *actual* time thereby lost.; and if
150. upon the voyage the speed be reduced by defect in or breakdown of any part of her hull, machinery or equipment, the
151. time so lost, and the cost of any extra fuel consumed in consequence thereof, and all extra
152. expenses shall be deducted from the hire.
153.     16. That should the Vessel be lost, money paid in advance and not earned (reckoning from the date of loss or
154. being last heard of) shall be returned to the Charterers at once. That act of God, enemies, fire, restraint of Princes,
155. Rulers and People, and all dangers and accidents of the Seas, Rivers, Machinery, Boilers and Steam Navigation, and
156. errors of Navigation throughout this Charter Party, always mutually excepted.
157.     The vessel shall have the liberty to sail with or without pilots, to tow and to be towed, to assist vessels in
158. distress, and to deviate for the purpose of saving life and property.
159.     17. That should any dispute arise between Owners and the Charterers, the matter in dispute shall be referred to
160. *Arbitration in London as per Clause 48* ~~three persons at New York, one to be appointed by each of the parties hereto~~
161. ~~and the third by the two so chosen ; their decision or that of any two of them, shall be final, and for the purpose of~~
162. ~~enforcing any award, this agreement may be made a rule of the Court. The Arbitrators shall be commercial men.~~
163. *LMAA for claims not exceeding the amount of USD 50,000.*
164.     18. That the Owners shall have a lien upon all cargoes, and all sub-freights *and sub-hires* for any amounts due
165. under this Charter, including General Average contributions, and the Charterers to have a lien on the Ship for all
166. monies paid in advance and not earned, and any overpaid hire or excess deposit to be returned at once. Charterers
167. will not suffer, nor permit to be continued, any lien or encumbrance incurred by them or their agents, which might
168. have priority over the title and interest of the Owners in the vessel.
169.     19. That all derelicts and salvage shall be for Owners' and Charterers' equal benefit after deducting Owners' and

170. Charterers' expenses and crew's proportion. General Average shall be adjusted, stated, and settled, according to
171. ~~Rules 1 to 15, inclusive, 17 to 22, inclusive, and Rules F of~~ York-Antwerp Rules ~~1924~~ *1994 or any subsequent*
172. *modification thereof, in London unless another place is agreed in the Charter. Cargo's contribution to General*
173. *Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master,*
174. *Pilot or Crew,* ~~at such port or place in the United States as may be selected by the carrier, and as to matters not~~
175. ~~provided for by these Rules, according to the laws and usages at the port of New York. In such adjustment~~
176. ~~disbursements in foreign currencies shall be exchanged into United States money at the rate prevailing on the dates~~
177. ~~made and allowances for damage to cargo claimed in foreign currency shall be converted at the rate prevailing on the~~
178. ~~last day of discharge at the port or place of final discharge of such damaged cargo from the ship. Average agreement~~
179. ~~or bond and such additional security, as may be required by the carrier, must be furnished before delivery of the~~
180. ~~goods. Such cash deposit as the carrier or his agents may deem sufficient as additional security for the contribution~~
181. ~~of the goods and for any salvage and special charges thereon, shall, if required, be made by the goods, shippers,~~
182. ~~consignees or owners of the goods to the carrier before delivery. Such deposit shall, at the option of the carrier, be~~
183. ~~payable in United States money and be remitted to the adjuster. When so remitted the deposit shall be held in a~~
184. ~~special account at the place of adjustment in the name of the adjuster pending settlement of the General Average and~~
185. ~~refunds or credit balances, if any, shall be paid in United States money.~~
186. ~~In the event of accident, danger, damage, or disaster, before or after commencement of the voyage resulting~~
187. ~~from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the carrier~~
188. ~~is not responsible, by statute, contract, or otherwise, the goods, the shipper and the consignee, jointly and severally,~~
189. ~~shall contribute with the carrier in general average to the payment of any sacrifices, losses, or expenses of a general~~
190. ~~average nature that may be made or incurred, and shall pay salvage and special charges incurred in respect of the~~
191. ~~goods. If a salving ship is owned or operated by the carrier, salvage shall be paid for as fully and in the same~~
192. ~~manner as if such salving ship or ships belonged to strangers.~~
193. *It is understood that the charter hire is not to be contributed to General Average.*
194.         Provisions as to General Average in accordance with the above are to be included in all bills of lading issued
195. hereunder.
196.         20. Fuel used by the vessel while off-hire, ~~also for cooking, condensing water, or for grates and stoves~~ to be
197. agreed to as to quantity, and the cost of replacing same, to be allowed by Owners.
198.         21. ~~That as the vessel may be from time to time employed in tropical waters during the term of this Charter,~~
199. ~~Vessel is to be docked at a convenient place, bottom cleaned and painted whenever Charterers and Captain think~~
200. ~~necessary, at least once in every six months, reckoning from time of last painting, and payment of the hire to be~~
201. ~~suspended until she is again in proper state for the service.~~
202. *No dry-dock during the currency of this charter unless in case of emergency or if/when mutually agreed between*
203. *Owners and Charterers (See Clause 93)*...................................................................................
204.         22. Owners shall maintain the gear of the ship as fitted, providing gear (for all *cranes and power derricks*)
205. ~~capable of handling lifts up to~~ *in accordance with description clause* ~~three tons,~~ also providing ropes, falls, slings
206. and blocks *as onboard.* If vessel is fitted with *cranes* ~~derricks~~ capable of handling heavier lifts, Owners are to
207. provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.
208. Owners also to provide on the vessel *sufficient lights as on board* ~~lanterns and oil~~ for night work, ~~and vessel to give~~
209. ~~use of electric light when so fitted, but any additional lights over those on board to be at Charterers' expense.~~ The
210. Charterers to have the use of any gear on board the vessel.
211.         23. ~~Vessel to work night and day, if required by Charterers, and all winches to be at Charterers' disposal during~~
212. ~~loading and discharging ;steamer to provide one winchman per hatch to work winches day and night, as required,~~
213. ~~Charterers agreeing to pay officers, engineers, winchmen, deck hands and donkeymen for overtime work done in~~
214. ~~accordance with the working hours and rates stated in the ship's articles. If the rules of the port, or labor unions,~~
215. ~~prevent crew from driving winches, shore Winchmen to be paid by Charterers. In the event of a disabled winch or~~
216. ~~winches, or insufficient power to operate winches, Owners to pay for shore engine, or engines, in lieu thereof, if~~
217. ~~required, and pay any loss of time occasioned thereby.~~
218.         24. ~~It is also mutually agreed that this Charter is subject to all the terms and provisions of and all the exemptions~~
219. ~~from liability contained in the Act of Congress of the United States approved on the 13ᵗʰ day of February, 1893, and~~
220. ~~entitled "An Act relating to Navigation of Vessels, etc." in respect of all cargo shipped under this charter to or from~~
221. ~~the United States of America. It is further subject to the following clauses, both of which are to be included in all~~
222. ~~bills of lading issued hereunder :~~
223.                         ~~U.S.A. Clause Paramount~~
224. ~~This bill of lading shall have effect subject to the provisions of the Carriage of Goods by Sea Act of the United~~
225. ~~States approved April 16, 1936, which shall be deemed to be incorporated herein, and nothing herein contained~~
226. ~~shall be deemed a surrender by the carrier of any of its rights or immunities or an increase of any of its~~
227. ~~responsibilities or liabilities under said Act. If any term of this bill of lading be repugnant to said Act to any~~
228. ~~extent, such term shall be void to that extent, but no further.~~
229.                         ~~Both to Blame Collision Clause~~

230. ~~If the ship comes into collision with another ship as a result of the negligence of the other ship and any act,~~
231. ~~neglect or default of the Master, mariner, pilot or the servants of the Carrier in the navigation or in the~~
232. ~~management of the ship, the owners of the goods carried hereunder will indemnify the Carrier against all loss or~~
233. ~~liability to the other or non-carrying ship or her owners in so far as such loss or liability represents loss of, or~~
234. ~~damage to, or any claim whatsoever of the owners of said goods, paid or payable by the other or non-carrying~~
235. ~~ship or her owners to the owners of said goods and set off, recouped or recovered by the other or non-carrying~~
236. ~~ship or her owners as part of their claim against the carrying ship or carrier.~~
237.      25. The vessel shall not be required to enter any ice-bound port, or any port where lights or light-ships have
238. been or are about to be with-drawn by reason of ice, or where there is risk that in the ordinary course of things the
239. vessel will not be able on account of ice to safely enter the port or to get out after having completed loading or
240. discharging. *See Clause 84.*
241.      26. Nothing herein stated is to be construed as a demise of the vessel to the Time Charterers. The Owners to
242. remain responsible for the navigation of the vessel, *acts of pilots and tugboats*, insurance, crew, and all other matters,
243. same as when trading for their own account.
244.      27. A commission of *1.25* ~~2 1/2~~ per cent is payable by the Vessel and Owners to
245. ..........................................................................................
246. on hire earned and paid under this Charter, and also upon any continuation or extension of this Charter.
247.      28. An address commission of *2.5* ~~2 1/2~~ per cent payable to.... *Charterers* .....on the hire earned and paid under
248. this Charter.

*Additional Rider Clauses 29 to 94, to be deemed part of and incorporated in this Charter Party.*


                    Owners                                        Charterers

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

**Clause 29 – Shore Watchman**
Shore watchman or watchmen to be for owners' account if requested only by Owners/Master. However, if such shore watchman (men) to be used or employed by reason of cargo, or if required by port authorities, then cost of shore watchman (men) to be for Charterers' account. Compulsory watchman (men) to be for Charterers' account. Shore watchman (men) and/or gangway watchman (men) in calling U.S.A Ports shall always to be for Charterers' account unless if requested by Owners/Master.

**Clause 30**
All negotiations and eventual fixture to be kept private and confidential.

**Clause 31 – Certificates / Vaccinations**
Owners are obliged to deliver and keep the vessel, her crew and anything pertaining hereto supplied with up-to-date and complete certificates and approvals and equipment and fittings, enabling the vessel and her crew to load, carry and discharge all cargoes permitted under this Charter Party, and bunker within the trading limits of this Charter Party.

It is the responsibility of the master and the owners to arrange for any vaccination required at ports of call and to keep on board corresponding valid certificates, failing this, any time lost and all extra expenses to be for owners' account, and may be deducted from the hire.

**Clause 32 – Tonnage certificates**
Upon delivery, the vessel shall have on board tonnage certificate, valid for the duration of this charter party, and such tonnage certificate shall comply with current requirements of ports of call within the trading limits of this Charter Party.

**Clause 33 – ITF / Flag Restrictions**
Owners warrant that the officers and crew of the Vessel are covered for the duration of this charter party by an I.T.F. agreement acceptable world wide within trading limits or equivalent agreement. Loss of time as a result of non-compliance shall be considered as off-hire.

In the event of loss of time, delay of impossibility of or restriction on the full working of the vessel resulting from any action that may be taken against the ship by third party on grounds due to or connected with the country of registration of the ship, the flag flown by the ship, and the condition upon which the crew of the ship is engaged and employed by the owners. The owners are to remain responsible for the above mentioned action, loss of time, delay or impossibility of or restriction of working, and any time loss consequently upon the above mentioned action by third parties, shall be considered as off-hire and to be deducted from the hire, and any extra expenses resulting from such action shall be payable and paid for by the Owners, or in Charterers' option, shall be deducted from the hire.

Owners warrant that the vessel, to the best of their knowledge, is not blacklisted by any country within the trading limits of this charter party, on the date of this Charter Party.

**Clause 34 – Oil Pollution**
The Owners shall provide a financial security for oil pollution if required for the calling at port or area as far as same shall be available through arrangement of P & I Club or other similar body(ies) without expenses or with nominal expenses by the Owners. However, in the event of introduction of any new rules, regulations or the like or changes thereto, compliance therewith increases burden to the Owners, the parties hereto shall consult each other in good faith for the best possible solution

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

Owners protecting clause for calling Yemen as following:-

After completing loading vessel's hatches to be sealed by independent surveyors (surveillance or others) at Charterers time/expense and prior commencing discharge Yemen hatches to be unsealed again by independent surveyors at Charterers time/expense.

Owners will not be liable for any cargo shortages at discharge. Eventual claims for cargo shortages to be for Charterers' account and time.

If vessel is fined for not reaching the minimum discharge productivity at Yemen due to lack of trucks or lack of take away capacity from receivers, or for any other reason not attributable to owners/vessel, then such fine to be for Charterers'/receivers' account and to be settled directly between Charterers/receivers/their nominated agents.

Notwithstanding above trading exclusion, Charterers have option to request Owners to allow calling of Orinoco River, Angola, Libya, Liberia with Owners protecting clause, which not unreasonable withhled by Owners.

No direct trading between China and Taiwan or visa versa.

No Indian coastal trade or consecutive voyages with aggregates.

Vessel not to trade in ice.

### Clause 41 – Cargo Exclusions
Vessel can be employed in carrying lawful merchandise cargoes but always excluding cargoes restricted by as follows:-

Antiques, art objects and curios, Ashes, Automobiles or cars or trucks or lorries or any other vehicles, Banknotes or other forms of currency, Bonds or other negotiable instruments, Bullion, Calcium nitrate, Calcium oxychloride, Corrosives, Stones or other objects of a rare or precious nature, Stone blocks, Livestock, Injurious and/or inflammable and/or dangerous goods, Listed cargo in the IMO blue books (IMDG code), Arms, Arms and war materials, Ammunitions, Nuclear materials and waste, Radio isotopes, Radioactive materials and wastes, Explosives, Black powders, Blasting caps, Detonators, Bombs, Dynamite, TNT, Hazardous cargoes, Hides, Coffee, Cocoa, Niger seeds, Seed cakes, Manioc and manioc pellets, Copra, Copra products, Sunflowers seed expellers, Oil cakes, Macoya expellers, Macoya pellets, Cotton, Quebracho, Pyrites, Granite, Asbestos, Zinc, Charcoal, Pond coal, Indian coals, Indian coke, Sludge ore, Chrome ore, Pitch in bulk(incl. Pencil pitch), Ferro silicon, Iron pellets, Sponge iron, Direct reduced iron ore and its products, Pig iron, Hot briquetted iron(HBI), Hot moulded briquettes, Ammonia, Ammonium nitrate, Ammonium sulphate except fertilizer grade, Calcium hypochlorite, Calcium carbide, Sodium sulphate in bulk, Harmful and corrosive fertilizers, Chilean nitrate, Soda ash, Ashes, Creosoted goods, Acids, Technical urea, Resin, Caustic soda, Borax, Clay, Bagged cargoes incl Bag rice, Fishmeal, Salt, Sulphur, Petcoke, Cement clinker, Bulk cement, Lime, Salt cake, Slurry, Turpentine, Any kind of Sand, Any kind of Log, Naphta, Tar and its products, Petroleum and its products, Asphalt, Bitumen, Milled rice, Mobile homes, Motor vehicles, Yachts, Bones and bone meals, Containers, Metal borings and cuttings, Motor spirits, Any kind of Scrap including motor blocks and turnings, Any cargoes embargos by the United Nations.

Bulk cargoes listed in the IMO code of safe practice for solid bulk cargoes 1998 which can not be certified by Charterers/Shippers as harmless and/or having a history of shipment without problems. Charterers undertake to load vessel in accordance with IMO code of safe practice for solid bulk cargoes 1998 also in accordance with any local regulations. All cargoes (especially concentrate and

3/25

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
### CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

coal) to be loaded, stowed, carried and discharged strictly in accordance with IMO code of safe practice for solid bulk cargoes 1998 and local regulations.

Irrespective of what is mentioned above, Charterers are allowed to carry max 3 cargoes total during this charter periods of the following commodities ;-

1) NO Salt
2) Max 1 cargoes of Sulphur
3) Max 1 cargoes of Petcoke
4) Max 1 cargoes of Scrap including HMS 1+2 except motor blocks and turnings
5) Max 2 cargoes of Bulk Cement
6) Max 1 cargoes of Cement clinker
7) Max 1 cargoes of Ammonium Sulphate (Fertilizer grade only)

None of the above cargoes to be carried as last voyage prior to redelivery.

**Pig Iron Loading ; Charterers have option to load Pig Iron on the condition as follow;**
Charterers are to provide adequate dunnage and wood protection for the tank top(s) in the square of the hatches to master's entire satisfaction before loading commences. The loading and discharging requirements of the master shall be fully complied with so as to prevent any damage to the vessel during the loading and discharging of the pig iron at Charterers' time and expense, including such practice that the first layers of the cargo shall be loaded softly and slowly and same to be lowered to the tank tops before being released until the height of the cargo reaches at least three (3) feet above the dunnage and wood protection (that is until an adequate cushion is formed prior loading the balance of the cargo to the master's entire satisfaction.

If, in spite of master's endeavours to prevent damage occurring, damage is caused to the vessel, then any and all damage(s) caused/occurring, irrespective of whether same affects vessel's class and/or seaworthiness or not, whilst loading and/or discharging the cargo of pig iron, such damage(s) are to be repaired by Charterers at their time and expense prior redelivery of the vessel to owners and vessel shall remain on full hire at all times. However, if damage is caused by breakdown or default of vessel's machineries or crews, then all damages, repairs including time to be for owners' account.

**Pet Coke Loading ;-**
Petroleum coke mentioned herein is only limited to the type of non-hazardous/non oily/non dangerous green delayed and/or calcined type (needle/uncalcined always excluded). If Charterers exercise such option, Charterers endeavour to use the fewest holds possible, provided vessel's stability trim and stres spermit. Such cargo to be loaded/stowed/trimmed/discharged strictly in accordance with the latest IMO and/or any other latest regulations/rules applicable to such cargo.

After discharge Charterers to arrange at their expense/time for any additional/special wash down of holds carrying such cargo by chemicals upto entire satisfaction of owners/master that all oily residues has been removed. Any additional chemicals/fresh water be required by master to be at Charterers account.

**Sulphur/Salt loading** : Charterers undertake to use holds as less as possible provided vessel's stability trim, stress permitting and not first cargo from delivery subject the following limewash clause:

Charterers to arrange lime washing the vessel's cargo holds at their time, risk and expenses prior loading, also to wash down cargo holds with fresh water after completion of discharge so that cleaning of cargo holds/removal of all cargo residues and limes upto entire satisfaction of Master at Charterers time, risk and expenses. Should any chemicals/additional fresh water be required by master for cleaning holds after discharging, Same to be arranged by Charterers at Charterers' time, risk and

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

expenses. After discharging of such cargo, the Charterers are responsible for cargo holds and the vessel's other parts or facilities (as may be required due to the carriage of such cargo) being water washed and cleaned upto Master's satisfaction, all at the Charterer's time, risk and expenses.

**Scrap loding:** Charterers are permitted to carry Max 2 (two) cargoes of shredded scrap only during this periods but always excluded HMS 1+2, motor blocks and turnings. No needle / pointed scrap to be loaded which will puncture the tank top. Charterers to arrange cleaning of cargo holds after completion of discharge upto entire satisfaction of owners/master that all residue has been removed. Should any chemicals/additional fresh water be required by master for cleaning holds after discharging, Same to be arranged by Charterers at Charterers' time, risk and expenses

Cargo to be loaded as per following scrap/soft loading clauses ;-

Scrap to be non-oily, harmless and to be carried in accordance with fully updated IMO code of safe pratice for solid bulk cargoes (as amended) and other applicable code. Charterers to load scrap cargo slowly and as close as possible to tank top into hold to master's satisfaction so as not to cause any damage on longitudinal bulkheads, tanktop, side tanks, etc. Loading into vessel upto 2 (two) metres height with master's satisfaction which not to be unreasonable withheld, shall not be turned by chutes and cargo shall be carefully layered onto the entire hold bottom prior commencing of any dumping as customary at load port. Master has the right to stop loading should stevedores/other loading personnels fail to comply with above and/or endanger the vessel and/or her equipments/fittings at any stage of loading.

Additional clauses (A to E) to apply if scrap is loaded;-

   A. A joint survey to be held regarding vessel's hold condition before the commencement of scrap cargo loading with time/cost of same being for Charterers account
   B. A further joint survey to be held after completion of discharge of scrap at final discharge port stating what damage, if any, has been caused to vessel with time/cost of same being for Charterers account.
   C. If stevedore damage is ascertained by the survey reports then Charterers are to repair such damage at final discharge port without any delay upto entire satisfaction of owners/master at Charterers' time, risk and expenses.
   D. This clause does not relieve Charterers firm liability for hidden damages caused by stevedores.
   E. Charterers to give owners adequate notice of their intention to load scrap cargo so that they may appoint surveyor as per (A).

**Cement loading :** Charterers undertake to use holds as less as possible provided vessel's stability trim, stress permitting and not first cargo from delivery. Charterers to arrange cleaning of cargo holds, responsible and to pay for through washing down of all holds immediately after discharge to keep holds paint in good condition upto entire satisfaction of master/owners that all residue has been removed. Should any chemicals/additional fresh waters be required by master for cleaning holds after discharging, same to be arranged by Charterers at Charterers' time, risk and expenses.

Charterers have the option to cut holes on hatch covers for loading bulk cement on following conditions:-

   1. Well production to bilge wells of all holds is strictly necessary to keep smooth suction while discharge hold washing water, by using gum tapes (plasters) or so.
   2. Charterers to indemnify Owners of all possible cargo solidification due to hold sweating which if it is impossible to avoid by proper operation of existing natural ventilation system.
   3. All cutting and restoring of the holes to be fully supervised/attended/approved by vessel's classification surveyor with written document.

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

4.  Holes to be cut at the suitable place of hatchcover in accordance with vessel's builder specification. When restoring cement holes, chill plates or similar material deemed necessary by master/surveyor to be fitted for complete welding in order to reinstate the hatchcovers back to their original condition.

5.  After completion of restoring holes, Owners' option to have hose test and untra sonic test for leaking point carried out in presence with vessel's classification surveyor and test result should be upto his satisfaction. Otherwise have obligation to rectify the situation until and when satisfied by the vessel's classification surveyors.

6.  During hose test carried out if water ingress into cargo holds and cargo damaged, all cost for damaged, time and cost relate will put into Charterers' account.

7.  All time for preparing cutting, restoring, testing upto classification surveyors' satisfaction as well as expense including classification surveyors' fee and expenses shall be for Charterers' account.

8.  Additional materials request and required by master and classification surveyor for sealing welding seams of cement holes are into Charterers' account

9.  Charterer to provide drawings and/or welding procedure to vessel's classification surveyor for verify and approval prior commence cutting.

10. If at load port and/or discharging port for conduct cutting and restoring cement   holes are not accept for hose testing in port as per port regulation, Charterers to be take full responsibility to shift the vessel into safe place and always afloat and Charterers' risk for conduct cutting or restoring cement holes as per 6). All time lost and expenses are Charterers' account.

Owners/vessel will not be responsible for the cleanliness of holds condition/passing subsequent and future hold survey, any extra cleaning if required to be for Charterers' time, risk and expenses. All necessary materials, tools and equipments required to be supplied by Charterers in accordance with Master's requirements.

**Steel cargo:** Steel cargo to be sufficiently dunnaged, lashed, secured and unlashed/unsecured at Charterers' risk, time and expenses under the supervision of master and to his satisfaction. If loading steel and steel products, Owners will have option to conduct pre-shipment survey through their P & I club surveyor at Charterers' time, risk, expenses and vessel to remain on hire. Surveyor's remarks if any related to cargo to be endorsed in mates' receipt and bills of lading.

**Deck cargo:** time, risk and expenses to be for Charterers' account and always subject to vessel's deck strength/stability and Master's discretion and Charterers to supply and pay for all lashing/stanchion and fitting etc. required by Master. Charterers to indemnify owners and remain accountable for any damage caused to vessel, its crew and/or any other person and/or any property due to loading of such cargoes on deck, Bills of lading for deck cargo to be claused "shipped on deck" on Charterers, shippers and receivers risk, expenses and responsibility without liability on the part of the vessel or her owners for any damage/expenses or delay howsoever caused.

**Concentrate:**
Charterers to load, stow, trim and discharge concentrates in accordance with IMO and local regulations and within the transportable moisture content of the cargo as ascertained in accordance with IMO Code of safe practice for bulk cargoes.

**Bagged cargo:** In case of bagged cargoes, due to stacking by Charterers stevedores and/or men, if there be any spillage of cargoes due to wear and tear of bags or due to any irregular stacking, vessel/master/owners shall not be responsible for same. All time, cost and expenses for rebagging spilled cargoes if any to be for Charterers account. Charterers to supply empty bag for rebagging the spilled cargo. In any event, master has the right to reject any damaged cargo in bulk or bags. Vessel/master/owners shall not be responsible for quality, quantity, colour and condition of cargoes in bags.

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

**Block stowage Clause:** The steel slabs are to be stowed, loaded and discharged strictly in accordance with custom of trade and local regulations including vertical block stow w/i vessel's tank top strength, if required by shippers/receivers. The cargo is to be properly dunnaged, lashed and secured to master's satisfaction at Charterers risk and expenses. Charterers must supply sufficient dunnage, lashing materials for loading such cargo.

**Clause 42 – Master / Crew Assistance**
Vessel to work day and night if required by the Charterers, and all gears to be at the Charterers' disposal during loading and discharging. Hire stipulated herein to include the following services;-

1. Clearing of cranes from stowage in preparation for loading and/or discharging.
2. First opening and last closing of hatches in preparation for loading and discharging.
3. Supervision of loading and/or discharging.
4. Maintaining power while loading and/or discharging, and care of cranes.
5. Shifting ship during loading and/or discharging, and shifting between berths.
6. Docking and undocking.
7. Bunkering.
8. Subject weather condition and local labour/port regulation permitting, officers and crew to shape up the ship's hatches and gear as much as possible prior to arrival at loading and/or discharging ports, docks and/or places so as to immediately commence loading and/or discharging operations.

If the rules of the port or labour unions prevent crew from opening and closing hatches, shore labour to be paid by the Charterers. In the event of a disabled winch or winches, owners to pay for shore engine or engines in lieu of thereof if required.

The vessels officers and crew shall perform extra work if so requested by the Charterers, such as cleaning holds, setting stanchions, lashing and relashing or unlashing of cargo or collecting and providing of dunnages and/or lashing materials including catwalks, cargo marks, painting and etc., providing and subject that shore and labour union's regulation permit/allow. Charterers to pay crew special bonus which agreed with an amount with master/crew directly per voyage. Thus, owners are not to be responsible for the result of such extra works done by the crew as per request of Charterers.

Although the Owners/Master shall not be responsible for all gear, equipment, and/or stores supplied to the vessel by or for Charterers' account, the Master shall keep a record of all such gear, equipment and/or stores so supplied and to maintain same in normal condition wear and tear except. Such gear, equipment, and/or stores to be redelivered to the Charterers prior to redelivery of the vessel to the Owners, or if required by the Charterers, at anytime during the charter, unless consumed.

**Clause 43 – Weather Routeing**
i) The Vessel shall, unless otherwise instructed by the Charterers, proceed by the customary route, but the Master may deviate from the route if he has reasonable grounds to believe that such a route will compromise the safe navigation of the Vessel.

ii) In the event the Charterers supply the Master with weather routeing information, although not obliged to follow such routeing information, the Master shall comply with the reporting procedure of that service.

In the event of a discrepancy between the deck logs and the weather routing reports, then the weather routing reports to be taken as ruling

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

**Clause 44 – Supercargoes / Port Captains**
At any stage of this Charter Party, the Charterers and/or their supercargoes, and in the presence of vessel's master and /or engineers and/or officers, shall have free access in Charterers' time and expense to the whole vessel, including bridge, holds and bunker tanks, provided on interference with vessel's normal operations.

Whenever required by the Charterers and/or their supercargoes and/or their surveyors, the Master shall endeavour to bring the vessel into even trim to ensure correct bunker soundings.

**Clause 45 – Performance**
If the Charteres have reason to be dissatisfied with the performance of the vessel, the Owners upon receiving complaints shall immediately investigate and take appropriate steps to correct the situation.

**Clause 46 – Stevedore Damage**
Should any damages be caused to the vessel or her fittings by the Charterers or their stevedores, the master and/or the owners shall do the following:

1.  Give written notice to the Charterers or their supercargo, or their agents, of full particulars of the damage caused, and the party allegedly responsible for the damage. Such notice to be given not later than 24(twenty-four) hours after the damage has occurred or prior to the vessel's sailing from the port. For stevedore damage not visible when carrying scrap or steel, such notices to be given not later than on completion of discharging of cargo.

2.  Give written notice to the party allegedly responsible, giving full particulars of the damage and its alleged cause, and endeavour to obtain the written acknowledgement of liability from such party, or failing that, master/vessel has to obtain the acknowledgement of receipt of such notice. Such notice to be given not later than 24(twenty-four) hours after the alleged damage occurs and, in any event, prior to the vessel's sailing from the port. For stevedore damage not visible when carrying scrap or steel, such notices to be given not later than on completion of discharge of cargo.

It is expressly agreed and understood by Owners that the purpose of compliance of Owners' and master's obligations in this clause is to preserve the Charterers' right of recourse against the party allegedly responsible, and if the Owners and/or master fail to comply with their obligations under this clause, the Charterers shall not be responsible to Owners for any such damage.

The Charterers shall have the liberty to redeliver the vessel without repairing the damage for which the Charterers are responsible as long as the damage do not affect the vessels seaworthiness or the proper working of the Vessel and/or her equipment but the Charterers undertake to reimburse costs of repair against production of repair bills by repairers of dockyard unless otherwise agreed. Any stevedore damage affecting the vessels seaworthiness or the proper working of the Vessel and/or her equipment, shall be repaired without delay to the Vessel after each occurrence in the Charterers' time, risk and shall be paid for by the Charterers before sailing from the port.

**Clause 47 – Off-Hire**
Deviation and/or delay because of sickness of the crew, shall be considered as off-hire, and all extra expenses in this connection shall be for Owners' account, and shall be deducted from the hire.

After suspension of hire, from any cause, the vessel shall be placed again at Charterers disposal at the same port or place or equidistant position where hire was suspended.

8/25

RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

The Charterers may in their option, at any time add to the Time charter period partly or wholly any off-hire period(s). The rate of hire for any such added period(s) shall be calculated and paid at the same rate as applicable during the off-hire periods(s).

During any off-hire period estimated to exceed eight(8) days, the Owners to give the Charterers not less than five(5) days approximate and three(3) days definite notice of resumption of the service.

**Clause 48 – Arbitration**
Arbitration in London and English law to apply.

All disputes arising out of this contract which cannot be amicably resolved shall be referred to arbitration in London.

Arbitrator to be appointed by each party, the reference shall be to two arbitrators. But if one party failing to appoint arbitrator within 14 days after another party has appointed one, then it will become sole arbitrator for the arbitration. The arbitrators and the umpire, if appointed, shall be the commercial men conversant with shipping knowledge, and the members of the London maritime arbitrators' association or otherwise qualified by experience to deal with shipping disputes.

The contract is governed by English law and there shall apply to arbitration proceedings under this clause the terms of the London maritime arbitrators' association current at the time when the arbitration proceedings are commenced.

**Clause 49 – Freshwater**
Freshwater is always for Owners' account, unless the freshwater is to be used by the special request from the Charterers, in which case Charterers' letter of instruction to master will cover all use of such freshwater, if so required.

**Clause 50 - Mutual Cancellation**
Mutual cancellation: Between any of the following countries, U.S.A, Nation of vessel's flag, Great Britain, C.I.S, People's Republic of China, becoming engaged as an actual participant in a war or war-like operation in which one or more of the above named countries directly affecting due fulfillment of this contract, Charterers and/or owners shall have the right to cancel this Charter Party without liabilities.

Such cancellation should take place at the port of destination after discharging cargo on board subject to the provisions of the attached chamber of shipping and war risk clauses. It is understood that the war or actual hostilities means direct war or hostilities or civil war, where any of the above countries support opposing sides.

**Clause 51 – Itinerary and Agents**
Charterers will endeavour to keep owners advised of vessel's itinerary and their agents' name at each port to enable owners to forward crew mails, arrange store, cash advances and other owners' husbanding matters.

**Clause 52 – Grain Fitted**
Vessel is fitted for carriage of grain in accordance with chapter VI of Solas 1974 and amendments, without requiring bagging, strapping and securing when loading a full cargo (deadweight) of heavy grain in bulk with ends untrimmed.

**RIDER CLAUSES TO M/V "FANY"/ HANJIN**
**CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006**

**Clause 53 – Vessel's Description**

MV "FANY"
- Korea Flag
- Built July 1994 Tsuneishi Shipbuilding Co. Ltd., Japan
- Singledeck Self-trimming Bulker
- Grain fitted when loaded/stowed as per vessel's Grain Plan
- DWAT'S
- 43,598 MT / 11.319 M Summer / TPC 49.6
- 42,433 MT / 11.084 M Winter / TPC 49.5
- 44,767 MT / 11.554 M Tropical / TPC 49.8
- 44,743 MT / 11.814 M Tropical FW / TPC 49.8
- LOA/Beam 185.84/30.4 M
- GRT/NRT 25,895/13,673
  Suez: 28,283.56/23,311.19
  Panama: No gross indicated/21,535
- Moulded Depth: 16.20 M / LBP: 177.97 M
- TPC: 49.6 at Summer Marks
- IMO No.:
- Classification: KR
- Call Sign:
- Inmarsat 'C' Telex No. :
- 5 Holds/Hatches
- Grain/Bale Capacities per hold in cuft.
  No. 1 350,116 /  338,847
  No. 2 392,473 /  382,204
  No. 3 392,939 /  382,709
  No. 4 390,828 /  382,631
  No. 5 366,305 /  359,870
  Total 1,892,666 / 1,846,261
- Hatch Sizes: (All in Meters)
  No. 1 - 19.20 X 15.30
  Nos. 2-5: 20.80 X 15.30
- Hatch Covers: End folding type steel hatch covers
  Doubleskinned Hatchcovers
- Speed/Consumption basis good weather conditions of upto Beaufort Force 4 and Douglas Sea State 3
  and no negative influence by swell/adverse currents:
  Average about 13.0 Knots(Laden) / 13.5 knots(Ballast) on about 27.5 MT
  IFO 380 CST plus 0.50 MT MDO
- Fuel Specifications:
  IFO:  RMG 380 within ISO 8217:2005(E)
  MDO:  DMB within ISO 8217:2005(E)
  Fuel Analyst: DNV
- Port Consumption: Idle about 2.5/3.0 M.T. IFO plus 0.3 MT MDO
  cranes working per 24 hours - about 3.7/4.5 M.T. IFO plus 0.3 MT MDO
- Vessel burns MDO in main engine when manoeuvering and when entering/leaving port and in
  restricted waters or in restricted visibility.
- Maximum IFO capacity: 1,700 M3 IFO/MDO capacity 75 M3 MDO on even keel at 90% or 1,600
  M3 IFO/75 M3 MDO if trimmed by stern
- Ballast Capacity: 16,000 M3 excluding Hold 3 C/Hold Ballast (11,000 M3)
- Fresh Water Tank Capacity: 300 M.T./Daily Production: 14 M.T.
  Consumption: 13 M.T.
- Tank Top Strength: 13.88 M.T./M2

RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

Basis Holds 2 and 4 empty:
Hold No. 1 = 21.94 MT/M2
Hold No. 3 = 22.75 MT/M2
Hold No. 5 = 21.9 MT/M2
Holds Nos. 2 and 4 = 13.88 MT/M2 for bulk cargoes.
- If loading steel cargoes vessel's holds to be loaded homogeneously in flat floor area at maximum
  13.88 M.T./M2
- Weather Deck 3.3 M.T.
- If alternate hold loading. 1-3-5 (2 and 4 may be empty) but
  Vessel not to be employed in this manner without permission of Owners.
- If Vessel loads to full DWT capacity with high density cargoes
  (i.e. cargoes stowing less than 35 cuft/MT), then Vessel to be loaded homogeneously.
- Deck Strength: 3.3 MT per M2
- Hatchcover Strength: 2.0 MT per M2
- Holds Flat Floor Area:  All in Meters - Area in square meters

| | Length | Breadth | | |
|---|---|---|---|---|
| | Fore | Mid | Aft | |
| No. 1 | 27.00 X | 12.20 | 21.24 | 23.90 | 527 M2 |
| No. 2 | 27.00 X | 23.90 | 23.90 | 23.90 | 641 M2 |
| No. 3 | 27.00 X | 23.90 | 23.90 | 23.90 | 641 M2 |
| No. 4 | 27.00 X | 23.90 | 23.90 | 23.90 | 641 M2 |
| No. 5 | 26.50 X | 23.90 | 20.24 | 11.48 | 520 M2 |

- Height in Holds 14.2 Meters.
- Cranes: 4 Electric hydraulic driven single deck cranes at 30 tons.
  No more than 1 crane to be worked at a hatch.
  Vessel has no crane operators on board.
  If grabs attached to Cranes then the weight of grab and cargo not to exceed 80% of the described safe
  working load of cranes under normal duty cycle of crane operation.
- Cranes located between Holds 1 and 2, Holds 2 and 3, Holds 3 and 4 and Holds 4 and 5
- Maximum reach of cranes: 24 Meters
- Estimated maximum outreach over the side: About 8.5 Meters
- Height of lowest part of crane pedestal to main deck: about 8.8 Meters
- Crane Manufacturer: Fukushima
- Hoisting Speed 18.5 M per minute at 30 Tons
- 4 electro-hydraulic Grabs at 12 CBM each.
- Vessel's grabs to be de-rated in keeping with density/stowage of cargo and SWL of Cranes under
  grab operation but the minimum size is 8 CBM. Owners make no representation of grab
  load/discharge rate using vessel's grabs and Charterers to follow directives of Master to avoid any
  overheating of grabs otherwise Charterers to be responsible for damage to hydraulic motors.
- Distance waterline to top of mast fully ballasted: 39.4 Meters
  Holds ballasted: 38 Meters
- Distance from waterline to top of hatchcoaming in ballast with no holds ballasted: 13.00
  Meters/10.75 Meters with No. 3 hold flooded
- Distance from bow to forepart No. 1 - 19 Meters
- Distance forepart No. 1 to aft No. 5 - 132 Meters
- Distance aft No. 5 to stern - 34.8 Meters
- Height from keel to radar mast - 45.5 Meters
- Distance from keel to hatch coaming - 18.25 Meters
- Distance from ship's side to hatch coaming stiffener - 6.5 Meters
- Distance from ship's side to the edge of hatch coaming - 7.5 Meters
- Measurement of any tank slopes/hoppering (height and distance from
  Vessel's side at tank top) - Distance: 3.3 Meters, Height 3.1 Meters
- Distance from tanktop to top of hatch coaming - 16.2 Meters

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

- Height of hatch coaming above main deck - 1.4 Meters
- Height of hatch coaming including hatch covers above main deck: 2.7 Meters
- Distance tank top to main deck - 14.2 Meters
- Constants about 600 M.T. excluding fresh water
- Natural Ventilation 2 PCS/Hold
- Vessel is not CO2 fitted
- Vessel is equipped with Australian Hold Ladders
- Vessel is strengthened for the carriage of heavy cargo
- Vessel has a loading manual for Steel Coils (15 tons) maximum 2 tiers in all holds. If Vessel loads full cargo of hot rolled coils, the approximate lift is about 35,500 M.T. and loading of Vessel to be in accordance with loading manual

(All details about and without guarantee)

### Owners confirm followings :-

1. Vessel to be classified 100 +A1 at Lloyds or equivalent
2. Vessel to be single decker/bulk carrier/bridge and Eng. room is aft
3. Vessel to have on board the valid and sufficient calibration scales in order to perform draft survey through this charter party
4. Vessels' hatch covers are to be weather tight all through this charter period and if any hatch cover found defective, same to be rectified at owners' time and expenses to the satisfaction of class surveyor
5. Vessel shall not change her class through this charter period without Charterers' written consent
6. Vessel will not be scheduled for break up or sold for scrap upon completion of this charter
7. Vessel is not black-listed in any port of call and ARAB league
8. Vessel has clear unobstructed main hold and is suitable for grab discharge in every respect and has on board a valid grain loading certificates
9. Vessel does not have a center line bulkhead and/or beam or any other obstruction

### Clause 54 –Speed and Consumption
The owners confirm that the vessel shall proceed with the utmost dispatch and shall be capable of performing the stated RPM at all times during the sea voyage, except when vessel encounters weather conditions of higher than beaufort scale four(4) and/or Douglas sea state 3(three).

"Good weather conditions" and "about " means maximum Beaufort force 4 (four) and/or Douglas sea state 3 (three) and plus/minus 5 (five) percent respectively. The Charterers may instruct the vessel to steam at any slow speed if practicable.

### Clause 55 – Taiwan / PRC Calling
Vessel is not to be ordered directly to/from Taiwan after/prior calling Mainland China as far as such direct calls are prohibited by the countries involved, and any consequences arisen therefrom to be at Charterers' time, risks and expenses.

### Clause 56 – Quarantine
Normal quarantine time and expenses for the vessels entering port shall be for Charterers account but any time of detention and expenses for quarantine due to pestilence, illness and etc. of Master, Officers and crew shall be for Owner's account.

### Clause 57 – Smuggling
Any delay, expenses and/or fines incurred on account of smuggling to be for Charterers' account if caused by Charterers' supercargo, their staff and/or Charterers' agent, Same to be for owners' account if caused by officers and/or crew and/or owners' agent.

**RIDER CLAUSES TO M/V "FANY"/ HANJIN**
**CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006**

**Clause 58 - Stowaways**
(a)(i) The Charterers warrant to exercise due care and diligence in preventing stowaways in gaining access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers.

(ii) If, despite the exercise of due care and diligence by the Charterers, stowaways have gained access to the Vessel by means of secreting away in the goods and/or containers shipped by the Charterers, this shall amount to breach of charter for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them. Furthermore, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Charterers' account and the Vessel shall remain on hire.

(iii) Should the Vessel be arrested as a result of the Charterers' breach of charter according to sub-clause (a)(ii) above, the Charterers shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

(b)(i) If, despite the exercise of due care and diligence by the Owners, stowaways have gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, all time lost and all expenses whatsoever and howsoever incurred, including fines, shall be for the Owners' account and the Vessel shall be off hire.

(ii) Should the Vessel be arrested as a result of stowaways having gained access to the Vessel by means other than secreting away in the goods and/or containers shipped by the Charterers, the Owners shall take all reasonable steps to secure that, within a reasonable time, the Vessel is released and at their expense put up bail to secure release of the Vessel.

**Clause 59 - Breakdown of Cranes**
In the event of breakdown of cranes by reason of disablement or insufficient power or otherwise unless caused by Charterers or Charterers servants, the hire to be reduced pro-rata for the period of such insufficiency in proportion to the number of cranes that were working at the time of breakdown of equipment.

If Charterers elect to continue work on hatch or hatches affected by breakdown by hiring shore appliance, Owners are to pay for shore appliances, but in such case Charterers are to pay full hire for all time shore appliances are working. Any stevedore and/or labor charges additionally accruing due to breakdown of vessel's equipment including costs for standby of stevedore and/or labor to be for Owners account but maximum one shift

If Charterers hire shore crane, it must be approved by Owners.

**Clause 60 – Lay/Can**
Owners to give the Charterers about 30/25 days full itinerary of vessel. Owners to give the Charterers 20 days approximate notice of delivery and to narrow layday with 10 days spread. It is understood that Owners will keep Charterers closely advised from time of fixture to delivery of vessel's schedule. Owners to keep Charterers regularly advised of vessel's expected date/place of delivery and in due course give 15/10/5/3/1 days notice of expected delivery.

Should the vessel not be delivered by the date of cancelling, the charterers shall have the option of cancelling. If the vessel cannot be delivered by the cancelling date, the Charterers, if required, shall declare within 48 running hours after receiving notice thereof whether they cancel or will take delivery of the vessel.

**RIDER CLAUSES TO M/V "FANY"/ HANJIN**
**CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006**

**Clause 61 – Hire Payment**
A) First 15 days hire and value of bunkers on delivery to be paid within 3 (Three) banking days after vessel's delivery. Charterers are entitled to deduct from last sufficient hire payments estimated Owners disbursements, but maximum USD500.00 per port as well as estimated bunkers on redelivery value.

B) For hire calculation purpose, time on delivery / redelivery to be based on GMT.

C) Charterers to settle undisputed outstanding hire within 3 (Three) banking days after redelivery. Charterers to provide original vouchers for owners expenses/settlement within 90 days of final redelivery. If after 90 days vouchers are still awaited then the accounts are to be finalized based on vouchers actually submitted. Owners to refund on presentation to Charterers any amounts disbursed on Owners' behalf for which vouchers are submitted after that time.

D) With reference to Clause 5, it is agreed that the hire is to be considered correctly paid upon the confirmation from owner's banker that such remittance is fully receipt as stated in the description clause.

E) Deleted.

F) Notwithstanding anything contained herein to the contrary, it is understood that if at any time during the currency of this Charter the hire payment shall become due on a Saturday, Sunday or holiday or outside normal banking hours, payment of hire may be made on the next banking day immediately following the date on which hire become due and such payment shall stand as "punctual and regular payment".

G) Charterers have the right to withhold from Charter hire during the period of this Charter such reasonable amounts due them for off-hire time and Owners disbursement. But proper supporting statements are to be sent to Owners as soon as possible.

H) Hire to be remitted by TT to :

  Owners bank details ;-

| | |
|---|---|
| Beneficiary : | CHANGSUNG SHIPPING CO., LTD |
| Beneficiary's Bank : | KOREA EXCHANGE BANK, SEOSOMUN BRANCH |
| | 60-1, SEOSOMUN-DONG, CHUNG-KU, SEOUL, KOREA |
| Account Number : | 027 - JSD - 100121 – 2 |
| Swift : | KOEXKRSE |
| Reference : | |

I) Non-Payment of Hire Clause for Time Charter Parties
  a) If the hire is not received by the Owners by midnight on the due date, the Owners may immediately following such non-payment suspend the performance of any or all of their obligations under this Charter Party (and, if they so suspend, inform the Charterers accordingly) until such time as the payment due is received by the Owners. Throughout any period of suspended performance under this Clause, the Vessel is to be and shall remain on hire. The Owners' right to suspend performance under this Clause shall be without prejudice to any other rights they may have under this Charter Party.

# RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

b) The Owners shall notify the Charterers in writing within 24 running hours that the payment is overdue and must be received within 3 banking days from the time hire was due. If the payment is not received by the Owners within 3 banking days, the Owners may by giving written notice within 12 running hours withdraw the Vessel. The right to withdraw the Vessel shall not be dependent upon the Owners first exercising the right to suspend performance of their obligations under this Charter Party pursuant to sub-clause (a). Further, such right of withdrawal shall be without prejudice to any other rights that the Owners may have under this Charter Party.

c) The Charterers shall indemnify the Owners in respect of any liabilities incurred by the Owners under the Bill of Lading or any other contract of carriage as a consequence of the Owners' suspension of and/or withdrawal from any or all of their obligations under this Charter party.

d) If, notwithstanding anything to the contrary in this Clause, the Owners choose not to exercise any of the rights afforded to them by this Clause in respect of any particular late payment of hire or a series of late payments of hire, this shall not be construed as a waiver of their right either to suspend performance under sub-clause (a) or to withdraw the Vessel under sub-clause (b) in respect of any subsequent late payment under this Charter Party.

## Clause 62 – Bunker
Bunkers remaining on board as on delivery about 750-800 metric tons IFO plus about 80 metric tons MDO. Bunkers remaining on board as on redelivery to be about same quantities as on delivery. Prices both ends USD350/USD650 per metric ton respectively for IFO / MDO. Cost of bunkers remaining on board as on delivery to be paid with first hire payment. Estimated cost of bunkers remaining on board as on redelivery to be deducted from the last sufficient hire payment.

Owners option to supply bunker to the vessel at any convenient port provided same will not interfere with Charterers loading/discharging works.

Charterers option to bunkers prior delivery subject same not interfere with cargo operations.

In South Africa, Owners will allow supply of grade "RMF 25" instead of "RME 25".

In Thailand, Owners will allow supply of grade " 180 CST RME 25 CCR 18 % IFO.

## Clause 63 – On/Off Hire Survey
Joint on/off-hire surveys to ascertain vessel's condition and quantities of fuels remaining on board shall be carried out at delivery port or at first load port and at redelivery port. Joint on-hire survey to be carried out by independent surveyor on delivery in Owners' time unless concurrently with cargo operations and Joint off-hire survey by independent surveyor on redelivery in Charterers' time

Joint on/off-hire survey expenses to be shared equally by Owners and Charterers

## Clause 64 – Hold Cleaning
Charterers option to redeliver the vessel unclean against paying USD5,000 - lumpsum In Lieu Of Hold Cleaning including removal of dunnage/lashing removal and disposal.

<Hold conditions on delivery>
Vessel's holds on arrival first load port to be clean swept and washed down by fresh water and dried up so as to receive Charterers intended cargoes in all respects, free of salt, loose rust scale

15/25

RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

and previous cargo residues to satisfaction of the independent surveyors. If the vessel fails to pass any hold inspection, the vessel should be placed off-hire from the time of rejection until the vessel passes the same inspection again and any actual expenses incurred thereby to be for Owners' account. In case vessel partly passes cleanliness inspection and Charterers start cargo operations then vessel to be off-hire pro rata in relation to the holds not available to Charterers.

<Intermediate Hold Cleaning>
Upon completion of discharge of each cargo, The crew shall render customary assistance in cleaning all cargo compartments in preparation for the next cargo if required by the Charterers and if not prevented by any regulations or agreement whatsoever. Such cleaning work shall be performed while the vessel is en route to next loading port, provided that this can be safely done and that the duration of voyage is sufficient or in port provided shore regulations permit and always in Charterers' time, riks and expenses. The Charterers shall pay to the Owners USD600 per hold each time such cleaning is performed for normal cargoes and USD1,000 case cleaning after salt and/or sulphur and/or petcoke and/or scrap and/or bulk cement and/or cement clinker and/or concentrate. Any extra materials/chemicals/fresh waters that might be required as per master/ owners for such cleaning to be provided by Charterers accordingly.

The Owners will endeavour to effect such cleanings as best possible, but without any guarantee that the cargo holds will be sufficiently cleaned and accepted on arrival at the subsequent loading port and the Owners/vessel shall not be responsible for any consequences arising from the fact that the crew has been employed in cleaning and vessel to remain on-hire throughout.
If shore cleaning company is arranged by Charterers, intermediate hold cleaning charges not to be paid to Owners.

Throughout the currency of this Charter Party and at redelivery, the Charterers shall remain responsible for all costs and time, including deviation, if any, associated with the removal and disposal of cargo related residues and/or hold washing water and/or chemicals and detergents and/or waste as defined by MARPOL Annex V, Section 1 or other applicable rules relating to the disposal of such substances.

Clause 65 – Cable / Entertainment / Victualling
Charterers to pay USD 1,250 per 30 days or pro rata for cable/ entertainment /victualling.

Clause 66 – Bills of Lading / Letter of Indemnity
Charterers and/or their agents are hereby authorised by Owners to sign, on Master's behalf, Bills of Lading as presented in accordance with Mate's Receipt and/or Tally Clerks' Receipt without prejudice to this Charter Party. Charterers are to be fully responsible and indemnify Owners for all costs and consequences directly/ indirectly arising out of the issue of the above mentioned Bills of Lading.

Charterers will endeavour to ensure that original bill(s) of lading are tendered to master upon vessels' arrival at discharging port. Should original bill(s) of lading not be available at the port(s) of discharge, Owners would allow charterers to discharge cargo against a Letter Of Indemnity in accordance to Owners' P & I Club wording signed by one authorized senior officer in Charterers formal letter head. The original copy of the Letter Of Indemnity to be forwarded to owners' office as soon as the fax copy have been approved by the Owners.

Clause 67 – Padeye
Charterers have the option to weld padeyes on deck/hold at Charterers time, risks and expenses, Same to be removed prior to redelivery. Charterers have the option to redeliver the vessel without removing padeyes by paying USD10.00 per padeye to the Owners.

**RIDER CLAUSES TO M/V "FANY"/ HANJIN**
**CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006**

**Clause 68 – Breaking IWL**
Notwithstanding mentioned trading exclusions, Charterers have the option to break IWL but always with owners' prior approval which is not unreasonable withheld. If any extra expenses to break IWL to be for Charterers account and same not to exceed the London scale or Norwegian conditions whichever is applicable.

Vessel never to force ice nor push ice nor to follow ice breaker(s).

**Clause 69 – Panama / Suez Canal Transit**
The Owners confirm that the vessel shall be fully fitted for panama/suez canal transit and in possession of valid necessary certificates and equipment during the currency of this charter to comply with current regulations and requirements of both canals.

**Clause 70 - Off-Hire for over 30 Consecutive Days**
Should the vessel be placed off-hire more than 30 consecutive days, the Charterers have the right to cancel the balance period of this charter by giving notice to the Owners without prejudice to any other right the Charterers may have under this charter.

**Clause 71 – Owners Agent**
The Charterers may agree their agents to attend owners matter such as delivery, redelivery, dry-docking, hospitalization, repatriation of crew, supply of vessels stores and provisions, etc with the Owners paying Charterers agents actual expenses including attendance fee if any. The Charterers may also agree their agents to attend to trivial owners matters such as cash advance, crew mail, arranging shore pass with owners paying actual expenses including attendance fee if any.

**Clause 72 – Eligibility for Bunkering**
The Owners confirm that the vessel is eligible for bunkers in the United States of America, its territories and possessions in accordance with U.S. Coast guard regulations set forth in title 33 chapter 1 subchapter c part 155 and 156 code of federal regulations. The Owners also confirm that the vessel is eligible for bunkers in any other country.

**Clause 73 – Deviation / Put Back**
Should the vessel put back whilst on voyage by reason of breakdown of machinery, collision, stranding, fire or other accident or damage to the vessel or dry-docking or periodical survey, or deviate from the course of the voyage caused by sickness of or accident to the master, officers, crew or any person on board the vessel other than persons travelling by the Charterers request, or by reason of sending stowaway or refugee, salvage or by reason of the refusal of the master, officers or crew to do their duties or any Owners matters the payment of hire shall be suspended from the time of inefficiency in port or at sea until the vessel is again efficient in the same position or regain a point of progress equivalent to that the hire ceased hereunder. Bunkers consumed while the vessel is off-hire and all extra expenses incurred during such period shall be for Owners account.

However, should the Vessel be driven into port or anchorage by stress of weather or by any cause for which the Charterers are responsible under this Charter Party the Vessel shall remain on hire and all costs thereby incurred shall be for the Charterers' account.

**Clause 74 – Saving Life Refugee**
Owners shall have the liberty to deviate for the purpose of saving life at sea and landing the person saved. But in case found the person is refugee, any time hereby lost and extra expenses to be shared equally with parties involved in this Charter chain.

**RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006**

**Clause 75**
Deleted.

**Clause 76 – BIMCO ISM Clause**
From the date of coming into force of the International Safety Management (ISM) Code in relation to the Vessel and thereafter during the currency of this Charterparty, the Owners shall procure that both the Vessel and "the Company" (as defined by the ISM Code) shall comply with the requirements of the ISM Code. Upon request the Owners shall provide a copy of the relevant Document of Compliance (DOC) and Safety Management Certificate (SMC) to the Charterers.

Except as otherwise provided in this Charterparty, loss, damage, expense or delay caused by failure on the part of the Owners or "the Company" to comply with the ISM Code shall be for the Owners' account."

**Clause 77 – BIMCO ISPS / MTSA Clause for Time Charter Parties 2005**
(a)(i) The Owners shall comply with the requirements of the International Code for the Security of Ships and of Port Facilities and the relevant amendments to Chapter XI of SOLAS (ISPS Code) relating to the Vessel and "the Company" (as defined by the ISPS Code). If trading to or from the United States or passing through United States waters, the Owners shall also comply with the requirements of the US Maritime Transportation Security Act 2002 (MTSA) relating to the Vessel and the "Owner" (as defined by the MTSA).

(ii) Upon request the Owners shall provide the Charterers with a copy of the relevant International Ship Security Certificate (or the Interim International Ship Security Certificate) and the full style contact details of the Company Security Officer (CSO).

(iii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Owners or "the Company"/"Owner" to comply with the requirements of the ISPS Code/MTSA or this Clause shall be for the Owners' account, except as otherwise provided in this Charter Party.

(b)(i) The Charterers shall provide the Owners and the Master with their full style contact details and, upon request, any other information the Owners require to comply with the ISPS Code/MTSA. Where sub-letting is permitted under the terms of this Charter Party, the Charterers shall ensure that the contact details of all sub-charterers are likewise provided to the Owners and the Master. Furthermore, the Charterers shall ensure that all sub-charter parties they enter into during the period of this Charter Party contain the following provision:

"The Charterers shall provide the Owners with their full style contact details and, where sub-letting is permitted under the terms of the charter party, shall ensure that the contact details of all sub-charterers are likewise provided to the Owners".

(ii) Loss, damages, expense or delay (excluding consequential loss, damages, expense or delay) caused by failure on the part of the Charterers to comply with this Clause shall be for the Charterers' account, except as otherwise provided in this Charter Party.

(c)Notwithstanding anything else contained in this Charter Party all delay, costs or expenses whatsoever arising out of or related to security regulations or measures required by the port facility or any relevant authority in accordance with the ISPS Code/MTSA including, but not limited to, security guards, launch services, vessel escorts, security fees or taxes and inspections, shall be for the Charterers' account, unless such costs or expenses result solely from the negligence of the Owners, Master or crew. All measures required by the Owners to comply with the Ship Security Plan shall be for the Owners' account.

**RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006**

(d) If either party makes any payment which is for the other party's account according to this Clause, the other party shall indemnify the paying party.

**Clause 78–War Risks Clause for Time Charters, 2004 (Code Name: CONWARTIME 2004)**
(a) For the purpose of this Clause, the words:
    (i) "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and

    (ii) "War Risks" shall include any actual, threatened or reported:
    war; act of war; civil war; hostilities; revolution; rebellion; civil commotion; warlike operations; laying of mines; acts of piracy; acts of terrorists; acts of hostility or malicious damage; blockades (whether imposed against all vessels or imposed selectively against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever); by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(b) The Vessel, unless the written consent of the Owners be first obtained, shall not be ordered to or required to continue to or through, any port, place, area or zone (whether of land or sea), or any waterway or canal, where it appears that the Vessel, her cargo, crew or other persons on board the Vessel, in the reasonable judgement of the Master and/or the Owners, may be, or are likely to be, exposed to War Risks. Should the Vessel be within any such place as aforesaid, which only becomes dangerous, or is likely to be or to become dangerous, after her entry into it, she shall be at liberty to leave it.

(c) The Vessel shall not be required to load contraband cargo, or to pass through any blockade, whether such blockade be imposed on all vessels, or is imposed selectively in any way whatsoever against vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever, or to proceed to an area where she shall be subject, or is likely to be subject to a belligerents' right of search and/or confiscation.

(d) (i) The Owners may effect war risks insurance in respect of the Hull and Machinery of the Vessel and their other interests (including, but not limited to, loss of earnings and detention, the crew and their protection and Indemnity Risks), and the premiums and/or calls therefor shall be for their account.
    (ii) If the Underwriters of such insurance should require payment of premiums and/or calls because, pursuant to the Charterers' orders, the Vessel is within, or is due to enter and remain within, or pass through any area or areas which are specified by such Underwriters as being subject to additional premiums because of War Risks, then the actual premiums and/or calls paid shall be reimbursed by the Charterers to the Owners at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(e) If the Owners become liable under the terms of employment to pay to the crew any bonus or additional wages in respect of sailing into an area which is dangerous in the manner defined by the said terms, then the actual bonus or additional wages paid shall be reimbursed to the Owners by the Charterers at the same time as the next payment of hire is due, or upon redelivery, whichever occurs first.

(f) The Vessel shall have liberty:-
    (i) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery, or in any other way whatsoever, which are given by the Government of the Nation under whose flag

# RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government, body or group whatsoever acting with the power to compel compliance with their orders or directions;

(ii) to comply with the order, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance;

(iii) to comply with the terms of any resolution of the Security Council of the United Nations, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement;

(iv) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier;

(v) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions.

(g) If in accordance with their rights under the foregoing provisions of this Clause, the Owners shall refuse to proceed to the loading or discharging ports, or any one or more of them, they shall immediately inform the Charterers. No cargo shall be discharged at any alternative port without first giving the Charterers notice of the Owners' intention to do so and requesting them to nominate a safe port for such discharge. Failing such nomination by the Charterers within 48 hours of the receipt of such notice and request, the Owners may discharge the cargo at any safe port of their own choice.

(h) If in compliance with any of the provisions of sub-clauses (b) to (g) of this Clause anything is done or not done, such shall not be deemed a deviation, but shall be considered as due fulfilment of this Charter Party.

**Clause 79**
Deleted.

**Clause 80 – BIMCO Bunker Fuel Sulphur Content Clause**
(a) Without prejudice to anything else contained in this Charter Party, the Charterers shall supply fuels of such specifications and grades to permit the Vessel, at all times, to comply with the maximum sulphur content requirements of any emission control zone when the Vessel is ordered to trade within that zone.

The Charterers also warrant that any bunker suppliers, bunker craft operators and bunker surveyors used by the Charterers to supply such fuels shall comply with Regulations 14 and 18 of MARPOL Annex VI, including the Guidelines in respect of sampling and the provision of bunker delivery notes.

The Charterers shall indemnify, defend and hold harmless the Owners in respect of any loss, liability, delay, fines, costs or expenses arising or resulting from the Charterers' failure to comply with this Sub-clause (a).

(b) Provided always that the Charterers have fulfilled their obligations in respect of the supply of fuels in accordance with Sub-clause (a), the Owners warrant that:

RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

(i)    the Vessel shall comply with Regulations 14 and 18 of MARPOL Annex VI and with the
       requirements of any emission control zone; and

(ii)   the Vessel shall be able to consume fuels of the required sulphur content when ordered
       by the Charterers to trade within any such zone.

Subject to having supplied the Vessel with fuels in accordance with Sub-clause (a), the Charterers
shall not otherwise be liable for any loss, delay, fines, costs or expenses arising or resulting from
the Vessel's failure to comply with Regulations 14 and 18 of MARPOL Annex VI.

(c)    For the purpose of this Clause, "emission control zone" shall mean zones as stipulated in
       MARPOL Annex VI and/or zones regulated by regional and/or national authorities such as, but
       not limited to, the EU and the US Environmental Protection Agency.

**Clause 81**
Deleted.

**Clause 82 – BIMCO Double Banking Clause**
(a)    The Charterers shall have the right, where and when it is customary and safe for vessels of
       similar size and type to do so, to order the Vessel to go, lie or remain alongside another vessel
       or vessels of any size or description whatsoever or to order such vessels to come and remain
       alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or
       discharging of cargo and/or bunkering.

(b)    The Charterers shall pay for and provide such assistance and equipment as may be required to
       enable any of the operations mentioned in this clause safely to be completed and shall give the
       Owners such advance notice as they reasonably can of the details of any such operations.

(c)    Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly
       agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided
       in (a) and (b) if in his reasonable opinion it is not safe so to do.

(d)    The Owners shall be entitled to insure any deductible under the Vessel's hull policy and the
       Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's
       Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.

(e)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities
       resulting from such operation. The Vessel shall remain on hire for any time lost including
       periods for repairs as a result of such operation.

**Clause 83 - Hamburg Rules Charterparty Clause**
Neither the Charterers nor their Agents shall permit the issue of any bill of lading, waybill or other
document evidencing a contract of carriage (whether or not signed on behalf of the Owner or on the
Charterers' behalf or on behalf of any Sub-Charterers) incorporating, where not compulsorily
applicable, the Hamburg Rules or any other legislation giving effect to the Hamburg Rules or any
other legislation imposing liabilities in excess of Hague or Hague/Visby Rules. Charterers shall
indemnify the Owners against any liability, loss or damage which may result from any breach of the
foregoing provisions of this clause.

**Clause 84**
Deleted.

RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

**Clause 85**
Deleted.

**Clause 86 – Requisition Clause**
Should the Vessel be requisitioned by the government of the Vessel's flag during the period of this Charter Party, the Vessel shall be deemed to be off-hire during the period of such requisition, and any hire paid by the said government in respect of such requisition period shall be retained by Owners. The period during which the Vessel is on requisition to the said government shall count as part of the period provided for in this Charter Party.

**Clause 87 – U.S. Anti Drug Abuse Act 1986 Clause for Time Charters**
(a) In pursuance of the provisions of the U.S. Anti Drug Abuse Act 1986, or any re-enactment thereof, the Charterers warrant to exercise the highest degree of care and diligence in preventing unmanifested narcotic drugs and marijuana to be loaded or concealed on board the Vessel.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners, the Master and the crew of the Vessel harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them individually or jointly.

Furthermore, all time lost and all expenses incurred, including fines, as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account and the Vessel shall remain on hire.

Should the Vessel be arrested as a result of the Charterers' non-compliance with the provisions of this Clause, the Charterers shall at their expense take all reasonable steps to secure that within a reasonable time the Vessel is released and at their expense put up bail to secure release of the Vessel.

The Owners shall remain responsible for all time lost and all expenses incurred, including fines, in the event that unmanifested narcotic drugs and marijuana are found in the possession or effects of the Vessel's personnel.

(b) In pursuance of the provisions of sub-clause (a) above, the Owners and the Charterers warrant that they shall both become signatories to the Sea Carrier Initiative Agreement on signing this Charter Party or on delivery of the Vessel under this Charter, whichever is the earlier, and will so remain during the currency of the Charter

**Clause 88 – U.S. Customs Advance Notification/AMS Clause for Time Charter Parties**
(a) If the Vessel loads or carries cargo destined for the US or passing through US ports in transit, the Charterers shall comply with the current US Customs regulations (19 CFR 4.7) or any subsequent amendments thereto and shall undertake the role of carrier for the purposes of such regulations and shall, in their own name, time and expense:

    i)      Have in place a SCAC (Standard Carrier Alpha Code);
    ii)     Have in place an ICB (International Carrier Bond);
    iii)    Provide the Owners with a timely confirmation of i) and ii) above; and
    iv)    Submit a cargo declaration by AMS (Automated Manifest System) to the US Customs and provide the Owners at the same time with a copy thereof.

(b) The Charterers assume liability for and shall indemnify, defend and hold harmless the Owners against any loss and/or damage whatsoever (including consequential loss and/or damage)

22/25

**RIDER CLAUSES TO M/V "FANY"/ HANJIN**
**CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006**

and/or any expenses, fines, penalties and all other claims of whatsoever nature, including but not limited to legal costs, arising from the Charterers' failure to comply with any of the provisions of sub-clause (a). Should such failure result in any delay then, notwithstanding any provision in this Charter Party to the contrary, the Vessel shall remain on hire.

(c) If the Charterers' ICB is used to meet any penalties, duties, taxes or other charges which are solely the responsibility of the Owners, the Owners shall promptly reimburse the Charterers for those amounts.

(d) The assumption of the role of carrier by the Charterers pursuant to this Clause and for the purpose of the US Customs Regulations (19 CFR 4.7) shall be without prejudice to the identity of carrier under any bill of lading, other contract, law or regulation.

### Clause 89 - U.S. Tax Reform 1986 Clause
Any U.S. Gross Transportation Tax as enacted by the United States Public Law 99-514, (also referred to as The U.S. Tax Reform Act of 1986), including later changes or amendments, levied on income attributable to transportation under this charter party which begins or ends in the United States, and which income under the laws of the United States is treated as U.S. source transportation gross income, shall be reimbursed by the Charterers.

### Clause 90 - U.S. Trade - Unique Bill Of Lading Identifier Clause
The Charterers warrant that each transport document accompanying a shipment of cargo destined to a port or place in the United States of America shall have been endorsed with a Unique Bill of Lading Identifier as required by the U.S. Customs Regulations (19 CFR Part 4 Section 4.7.a) including subsequent changes, amendments or modifications thereto, not later than the first port of call.

Non-compliance with the provisions of this Clause shall amount to breach of warranty for the consequences of which the Charterers shall be liable and shall hold the Owners harmless and shall keep them indemnified against all claims whatsoever which may arise and be made against them.

Furthermore, all time lost and all expenses incurred including fines as a result of the Charterers' breach of the provisions of this Clause shall be for the Charterers' account.

### Clause 91 - U.S. Customs-Trade Partnership Against Terrorism (C-TPAT) Clause
The Charterers have voluntarily signed the C-TPAT Agreement with the U.S. Customs Service. The Owners, Master and Crew will use reasonable efforts to assist the Charterers to comply with their obligations under the C-TPAT Agreement. However, under no circumstances shall the Owners, Master and Crew be liable for any delays, losses or damages howsoever arising out of any failure to meet the requirements of the C-TPAT Agreement signed by the Charterers.

The Charterers agree to indemnify and hold the Owners, Master and Crew harmless for any claims made against the Owners, Master and Crew or for any delays, losses, damages, expenses or penalties suffered by the Owners arising out of the C-TPAT Agreement signed by the Charterers.

### Clause 92 – BIMCO Protective Clauses

"All Bills of Lading under this Charter Party shall contain the following clauses."

### Clause Paramount
The International Convention for the Unification of Certain Rules of Law relating to Bills of Lading signed at Brussels on 25 August 1924 ("the Hague Rules") as amended by the Protocol signed at Brussels on 23 February 1968 ("the Hague-Visby Rules") and as enacted in the country of shipment shall apply to this Contract. When the Hague-Visby Rules are not enacted in the country of shipment,

## RIDER CLAUSES TO M/V "FANY"/ HANJIN
## CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

the corresponding legislation of the country of destination shall apply, irrespective of whether such legislation may only regulate outbound shipments.

When there is no enactment of the Hague-Visby Rules in either the country of shipment or in the country of destination, the Hague-Visby Rules shall apply to this Contract save where the Hague Rules as enacted in the country of shipment or if no such enactment is in place, the Hague Rules as enacted in the country of destination apply compulsorily to this Contract.

The Protocol signed at Brussels on 21 December 1979 ("the SDR Protocol 1979") shall apply where the Hague-Visby Rules apply, whether mandatorily or by this Contract.

The Carrier shall in no case be responsible for loss of or damage to cargo arising prior to loading, after discharging, or while the cargo is in the charge of another carrier, or with respect to deck cargo and live animals.

### General Average
General Average shall be adjusted, stated and settled according to York-Antwerp Rules 1994 or any subsequent modification thereof, in London unless another place is agreed in the Charter.

Cargo's contribution to General Average shall be paid to the Carrier even when such average is the result of a fault, neglect or error of the Master, Pilot or Crew.

### New Jason Clause
In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Carrier is not responsible, by statute, contract or otherwise, the goods, Shippers, Consignees or owners of the goods shall contribute with the Carrier in general average to the payment of any sacrifices, losses or expenses of a general average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the goods.

If a salving ship is owned or operated by the Carrier, salvage shall be paid for as fully as if the said salving ship or ships belonged to strangers. Such deposit as the Carrier or his agents may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the goods, Shippers, Consignees or owners of the goods to the Carrier before delivery.

### Both-to-Blame Collision Clause
If the Vessel comes into collision with another ship as a result of the negligence of the other ship and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Carrier in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Carrier against all loss or liability to the other or non-carrying ship or her Owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying ship or her Owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying ship or her Owners as part of their claim against the carrying Vessel or Carrier. The foregoing provisions shall also apply where the Owners, operators or those in charge of any ship or ships or objects other than, or in addition to, the colliding ships or objects are at fault in respect of a collision or contact.

### Clause 93 – Dry Dock
Owners right to dry-dock the vessel for usual special survey/class docking within May/June 2007, for which charterers to position the vessel to Singapore/Japan range and to give minimum 30 days notice to owners for intermediate redelivery of the vessel to perform dry dock/special survey of maximum 30 days.

RIDER CLAUSES TO M/V "FANY"/ HANJIN
CHARTER PARTY DATED SEOUL, 19TH OCTOBER, 2006

Vessel to be placed off-hire upon dropping last outward sea pilot one safe port Singapore/Japan range with sufficient notice from Charterers and sufficient fuel onboard. All fuel used by the vessel while off-hire shall be for owners' account.

Vessel shall be put back on-hire at dropping last outward sea pilot dockyard or in charterers' option at a position or equivalent distance from last discharge port to the charterers' next destination with owners' giving 15/10/5/3/2/1 days notice to charterers.

Charterers have the option to add the above off-hire period to this charter party.

**Clause 94 – E/NOAD Clause for the Time Charter Parties**
If the Vessel calls at any port(s) or place(s) in the United States, including any United States territories, the Owners/Vessel shall submit an electronic notice of arrival/departure (E-NOA/D) in advance of departure from or arrival at such port(s) or place(s) to the U.S Coast Guard and/or US Customs & Border Protection (CBP) and/or the National Vessel Movement Center (NVMC) in compliance with US Coast Guard's arrival and departure reporting requirements, CBP Advance Passenger Information System (APIS) but related expense, if any, to be for Charterers' account.

- E N D -