BLANK ROME LLP
Attorneys for Defendant
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
The Chrysler Building
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD., | 08 CV 1562 (RMB) |
| Plaintiff, | |
| - against - | |
| TRANS POWER CO. LTD., | |
| Defendant. | |

## NOTICE OF FOREIGN LAW PURSUANT TO F. R. CIV. P. RULE 44.1

PLEASE TAKE NOTICE THAT, Defendant TRANS POWER CO. LTD., pursuant to F. R. Civ. P. Rule 44.1 intends to raise issue of foreign law, namely of English law, as set out in the attached declarations of Nicholas Woo dated March 17, 2008 and March 31, 2008, and opinion of Nevil Phillips dated March 27, 2008.

Date: New York, New York
       April 1, 2008

Respectfully submitted,

BLANK ROME LLP

By: _Jeremy Harwood_
Jeremy J.O. Harwood
405 Lexington Avenue
New York, New York 10174
(212) 885-5000
*Attorneys for Defendant*

BLANK ROME LLP
Attorneys for Defendant
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SAN JUAN NAVIGATION
(SINGAPORE) PTE. LTD.,

                Plaintiff,

      - against -

TRANS POWER CO. LTD.,

               Defendant.

07 CV 1562 (RMB)

## DECLARATION OF NICHOLAS WOO UNDER ENGLISH LAW

I, NICHOLAS WOO, declare under penalty of perjury:

1.    I am a partner of the firm of English solicitors, Birketts LLP, with offices at 24-26 Museum Street, Ipswich, Suffolk, England. I was admitted as a solicitor of the Supreme Court of England and Wales on 2nd September 1996 and admitted as a solicitor of the Supreme Court of Singapore in July 1988.

2.    I submit this declaration of English law based upon my personal knowledge of the claims alleged by SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD. ("San Juan") as stated in (i) its amended verified complaint in this matter, dated February 15,

601518.00602/6627531v.1

2008 ("Complaint"); its second amended verified complaint in this matter, dated March 27th, 2008 ("Amended Complaint") and (ii) my firm's representation of defendant Trans Power Co., Ltd. ("Trans Power") in the arbitration relating to the claims described below.

3.    I executed a previous declaration dated March 17, 2008, exhibited hereto as Ex. A., addressing San Juan's Complaint, which this present Declaration updates in respect of the additional claims stated in the amended Complaint.

### A.    THE ARBITRATION UNDER THE CHARTER

4.    San Juan's Complaint alleged that it has suffered "or will suffer" damages in the total sum ("as nearly as can be estimated at this time") of $1,474,054.53 plus interest and costs for claims arising out of a contract of charter party dated on or about January 8, 2008 (the "Charter"). I might add that although San Juan have commenced arbitration in London, they have not yet served their Claims Submission.

5.    San Juan's claims under the Charter arising from damage to a crane were originally stated in the Complaint to be as follows:

(i)    "Head owners Hanjin have already indicated their intention to pursue a claim for this [crane] damage" in the sum of $53,000 (Complaint,¶ 8, 18 [A]) for the repairs to the jib and repairs and replacing the grab US$ $51,580 (Id., ¶ 8, 18 [B]);

(ii)    Estimated "time lost" of $389,025.  (Id., ¶ 18 [C]);

(iii)    "estimated" sailing time from port of discharge to the repair yard in the sum of $63,180 (Id., ¶ 9, 18 [D]).

(Note: The figures at paragraph 8 of the Amended Complaint do not correlate with the figures at paragraph 18.)

6.     In fact, the Head owners of the Vessel are not Hanjin.  The Head owners are Chang Sung Shipping Co Ltd of Seoul ("Chang Sung").  They appear to have chartered the vessel to Hanjin by a charterparty dated 19th October 2006.  I believe that Hanjin then chartered the vessel to San Juan. I have not seen either charterparty.

7.     The claims stated in paragraph 18 A-D of the Amended Complaint are actually based on claims that are being made by Chang Sung against Hanjin.  These have been particularized in a recent email from Chang Sung's lawyers, Messrs Reed Smith Richards Butler.  We presume that Hanjin are making the same claims against San Juan, and San Juan are making the same claims against Trans Power down the chain of charter parties.

8.     The total sum of the claims stated in paragraph 18 A-D of the Complaint in respect of the crane damage is $556,785 (the "Indemnity Claims").  I call them Indemnity Claims because if Hanjin is not liable to Chang Sung, and if San Juan is not liable in turn to Hanjin, then San Juan is not entitled to a monetary award for these sums from Trans Power.  As far as I am aware, neither Hanjin nor San Juan have paid or settled Chang Sung's claims.

9.     I would attribute 75% of the costs claim of US$475,000 to the resolution of the dispute in London arbitration for the "Indemnity Claims".

**B.    THE LIEN CLAIMS**

10.    On or about 12th February, 2008, Chang Sung sent a notice of lien on sub-hire in the sum of $376,000 (the "Notice").

11.    Pursuant to the Notice Trans Power has not paid the sum of $376,000 that it might otherwise have paid San Juan (the "Lien Sum").

12.    Trans Power would be liable, under English law, to pay the Lien Sum twice if it ignored the Notice and paid the Lien Sum to San Juan.

13.    The Complaint claims $556,450.80 in "outstanding hire" (Id. ¶ 18 [F]) which should be reduced by the Lien Sum as otherwise Trans Power will have been required to provide security both to Chang Sung for San Juan's failure to pay the Lien Sum while San Juan has also obtained security by way of its Rule B Attachment in the same amount.

**C.    THE RELEASE OF THE CLAIMED ADVANCE HIRE**

14.    By Agreement between the parties two attached electronic funds transfers ("EFTs") representing the 5th hire payment were released in the total sum of US$323,623.69.  This was slightly more than the sum claimed at para 18H of the Amended Complaint plus interest.  San Juan agreed to reduce the amount secured under the Rule B attachment and its total claim for interest in proportion to the sum released.

15.    San Juan has refused to reduce its "costs" claim of $475,000 despite the consensual reduction of the principal claim by 17 percent.



**D.    ENGLISH LAW AS IT RELATES TO ACCRUAL OF A CAUSE OF ACTION FOR INDEMNITY**

        1.    **Under English Common Law**

16.    Under English common law, the cause of action will only accrue, upon a contract or any other obligation to indemnify a person against a liability to a third party, when the plaintiff has made payment to (and thereby discharged any liability to) the third party and <u>not</u> upon the happening of the event that gives rise to the indemnity. <u>See,</u> <u>Reynolds v. Doyle,</u> (1849) 1 M&G 753.

        2.    **Express And Implied Indemnity Under A Contract**

17.    In the absence of an express contract for indemnity providing otherwise, a cause of action for indemnity only accrues when liability to a third party is determined and that liability is discharged by way of settlement or payment of an award or judgment.

18.    As stated in the leading treatise <u>Chitty on Contracts</u> Vol. 1, ¶ 28-049, the pertinent pages of which are Exhibit 4 hereto, in respect of these propositions:

> **Indemnity against Liability.** Where a contract of indemnity is to indemnify a person against liability to a third party (eg under a liability insurance policy), the general modern rule is that the limitation period starts to run when the indemnifying party's liability is established by judgment, arbitration or binding settlement. However, that general rule is subject to the construction of the contract of indemnity. This may mean that the indemnifying party is liable as soon as the indemnified party is liable (that is, even before any establishing of that liability by, for example, judgment). At the other extreme, the contract may on its true construction provide that the indemnity is conditional on actual payment by the indemnified party in which case the cause of action will accrue only when such payment has been made. [footnotes omitted]

19.     In Telfair Shipping Corp. v. Inersea Carriers S.A. (The "CAROLINE P"),

[1984] 2 Lloyd's Rep. 466 [Q.B. (Com. Ct.)] the Commercial Court considered the issue

of the accrual of a shipowner's claim against a vessel charterer for indemnity in respect

of a cargo receivers' cargo damage claim.

20.     The Court held in material part:

> . . . even if the indemnity is to be construed as an indemnity
> against the incurring of liability such an indemnity could not
> have been invoked by the owners until they had incurred
> some actual liability to the receivers.

Id. at 476 (emphasis in original).

### E.     ENGLISH LAW ON CONSTRUCTION OF THE STATED CAUSE OF ACTION

21.     The English Commercial Court will construe a complaint based on its

factual allegations not simply on how the plaintiff chooses to label or plead its cause of

action, i.e., breach of contract or for indemnity.

22.     Contrary to paragraph 16 of the Amended Complaint, the "Indemnity

Claims" are not claims for breach of charterparty.

(i)     As regards the crane damage, Rider clause 46 is not clear because it is

mostly concerned with the procedure of a claim and not responsibility for damage

caused by damage.  Nevertheless, without prejudice to Charterers' denial of all

liability, the most that could be said is that this clause makes Charterers

responsible for damage caused by the stevedores.  This is an express, alternatively,

an implied indemnity.

(ii)    As regards the hull damage, the BIMCO Double Banking clause is an express indemnity on its very terms (see Rider clause 82(e)).

23.    San Juan suggest that they can also make their claim based on breach of the safe port warranty, although we have no detail of the precise allegation.

24.    However, even if San Juan are entitled to make this claim (which Trans Power denies),    San Juan would not be entitled to pursue a claim at this stage for substantial damages or any other form of substantive relief -    as matters stand, San Juan would be entitled ONLY to claim for:

(i)    nominal damages (which would be in a trivial sum in the absence of proof of any greater actual financial loss or actual liability which has in fact been incurred);

(ii)    declaratory relief to the effect that they are, in the event that third party claims are in due course properly paid or settled, entitled to an indemnity.

25.    A claim for nominal damages has a trivial value (as stated above); an award of £5 is common, although up to £50 has been awarded; however, in Grobelaar v News Group Newspapers Ltd [2002] 1 WLR 3024 the House of Lords awarded a sum of only £1 (see paragraph 10-006 of the leading treatise on the English law of damages, *McGregor on Damages*, the pertinent pages of which are Exhibit 5 hereto). Meanwhile, a claim for declaratory relief has no monetary value, and a judgment or award in connection with a declaration cannot be enforced against any given security - the relief merely comprises of a statement by the Tribunal to the effect that, in specified future circumstances, the claimants will be entitled to certain substantive financial relief as opposed to an award to

the effect that the claimants are entitled to the actual and immediate substantive relief which is capable of enforcement in the first instance (see <u>Household Machines v Cosmos Exporters</u> [1947] 1 KB 217).

26.    Thus:

(i)    San Juan are not entitled to a monetary award in respect of the Indemnity Claims unless and until they are found to have properly settled and/or paid Hanjin (who have properly settled and/or paid Chang Sung).

(ii)    San Juan are entitled to no more than nominal damages (in a trivial amount, probably not exceeding £50, and quite possibly as low as £1) in respect of any claim for damages brought now and in the absence of proof of any greater actual financial loss or actual liability which has in fact been incurred.

27.    Further, and against this background, it is my view that under English law, San Juan would not be entitled to obtain security for their claim since San Juan only have a contingent liability and are not, as yet, entitled to any monetary award in respect of the Indemnity Claims (*The Siskina* [1978] 1 Lloyds Rep 1) or any substantial (i.e. more than trivial) monetary award in respect of any claim for breach of the Charterparty.

28.    I enclose exhibited hereto as Ex B in support of the views stated in my First Declaration, an expert opinion from Mr Nevil Phillips, an English barrister of Quadrant Chambers. A copy of Mr Phillips' *curriculam vitae* is also enclosed in Ex B.

29.    Mr. Phillips is abroad so unavailable to "update" his expert opinion as it relates to the additional reference insertion to the additional claims in the Amended Complaint.

**F.    APPLICATION OF ENGLISH LAW TO THE INDEMNITY CLAIMS IN THE AMENDED COMPLAINT**

30.    I believe that the Indemnity Claims have not accrued, as a matter of English Law, because as far as I am aware, no settlement or payment has been made of them by San Juan to Hanjin or Head Owner. Further and alternatively, unless and until San Juan has properly settled or paid a third party claim, San Juan are only entitled to pursue a claim against Charterers for declaratory relief with no monetary value or for nominal damages (with only a trivial value) and are therefore not at this time, entitled to any or any substantial (i.e more than trivial) security.

**G.    THE AMENDED COMPLAINT**

31.    I refer to the Amended Complaint filed by the Plaintiff on 27th March 2008 and would like to make the following comments particularly in the context of what I have already mentioned above:

(i)    Paragraphs 24(A), (B) and (C) of the Amended Complaint represents the same albeit increased claims set out in Paragraphs 18(A), (B) and (C) of the Complaint and are Indemnity Claims. For the same reasons as those set out already in Paragraphs 15 to 28 above, the Plaintiff is not entitled to security for these claims.

(ii)    Paragraphs 24(D) and (H) of the Amended Complaint represents the same albeit increased claims set out in Paragraphs 18(E) and (G) of the Complaint. These are claims for straightforward alleged damages suffered by the Plaintiff.

   (iii) Paragraphs (F), (G) and (I) and (H) of the Amended Complaint are new claims but as admitted by the Plaintiff, these are claims for which they have not yet incurred any liability but are contingent on similar claims being made against the Plaintiff by Hanjin. They are therefore Indemnity Claims and in the same category as those claims mentioned in Paragraph 31(i) above. As such, for the same reasons as set out in Paragraphs 15 to 28 above, the Plaintiff is not entitled to security for these claims.

   (iv) I also note that the Plaintiff concedes that only US$558,480.64 allegedly due to them for outstanding hire and not the total claim of US$816,999.80 as set out in Paragraphs 18(F) and (H) of the Complaint confirming my Paragraph 13 above.

32. The expert opinion of Mr Phillips mentioned in Paragraph 27 above was prepared based on the documents stated therein before he had an opportunity to sight the Amended Complaint. It therefore makes no mention of the Amended Complaint. Due to urgent personal reasons, Mr Phillips is not contactable from 28th March 2008 until 7th April 2008 and is therefore not able to amend his opinion accordingly in time for this Declaration to be filed before this Court. I humbly request this Court to grant the Defendant leave for Mr Phillips to serve a supplementary opinion to make further comments on the Plaintiff's Amended Complaint when the Defendant files its Reply pursuant to Paragraph 5 of this Court's order dated 27th March 2008.

33.    I declare under penalty of perjury of the laws of the United States that the

foregoing is true and correct.

Dated: March 31st, 2008
at Ipswich, England

NICHOLAS WOO

# EXHIBIT A

BLANK ROME LLP
Attorneys for Defendant
Jeremy J.O. Harwood (JH 9012)
405 Lexington Avenue
New York, NY 10174
(212) 885-5000

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

SAN JUAN NAVIGATION
(SINGAPORE) PTE. LTD.,

                Plaintiff,

      - against -

TRANS POWER CO. LTD.,

                Defendant.

08 CV 1562 (RMB)

---

## DECLARATION OF NICHOLAS WOO UNDER ENGLISH LAW

I, NICHOLAS WOO, declare under penalty of perjury:

1.     I am a partner of the firm of English solicitors, Birketts LLP, with offices at 24-26 Museum Street, Ipswich, Suffolk, England. I was admitted as a solicitor of the Supreme Court of England and Wales on 2nd September 1996 and admitted as a solicitor of the Supreme Court of Singapore in July 1988.

2.     I submit this declaration of English law based upon my personal knowledge of the claims alleged by SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD. ("San Juan") as stated in (i) its amended verified complaint in this matter, dated February 15, 2008 ("Complaint"); and (ii) my firm's representation of defendant

Trans Power Co., Ltd. ("Trans Power") in the arbitration relating to the claims described below.

### A.    THE ARBITRATION UNDER THE CHARTER

3.    San Juan's Complaint alleges that it has suffered damages in the total sum of $1,474,054.53 plus interest and costs for Trans Power's alleged breach of a contract of charter party dated on or about January 8, 2008 (the "Charter"). I might add that although San Juan have commenced arbitration in London, they have not yet served their Claims Submission.

4.    San Juan's claims under the Charter arising from damage to a crane are stated in the Complaint to be as follows:

(i)    "Head owners Hanjin have already indicated their intention to pursue a claim for this [crane] damage" in the sum of $53,000 (Complaint, ¶ 8);

(ii)    loss of hire relating to the crane damage of $63,180 (Id., ¶ 9);

(iii)    Estimated "time lost" of $389,025. (Id., ¶ 18 [C]);

(iv)    "estimated" sailing time in the sum of $63,180 (Id., ¶ 9, 18 [D]).

5.    The total sum of the claims stated in paragraph 18 A-D of the Complaint in respect of the crane damage is $556,785 (the "Indemnity Claims").    I would attribute 75% of the costs claim of US$475,000 to the resolution of the dispute in London arbitration for the "Indemnity Claims".

6.    San Juan has provided no evidence that it has paid or provided security to the head owner of the Vessel in respect of any of the Indemnity Claims.

### B.    THE LIEN CLAIMS

7.    On or about 12th February, 2008, the registered or "head owner" of the Vessel sent a notice of lien on sub-hire in the sum of $376,000 (the "Notice").

8.      Pursuant to the Notice Trans Power has not paid the sum of $376,000 that it might otherwise have paid San Juan (the "Lien Sum").

9.      Trans Power would be liable, under English law, to pay the Lien Sum twice if it ignored the Notice and paid the Lien Sum to San Juan.

10.     The Complaint claims $556,450.80 in "outstanding hire" (Id. ¶ 18 [F]) which should be reduced by the Lien Sum as otherwise Trans Power will have been required to provide security both to the Head Owner for San Juan's failure to pay the Lien Sum while San Juan has also obtained security by way of its Rule B Attachment in the same amount.

### C.      THE RELEASE OF THE CLAIMED ADVANCE HIRE

11.     By Agreement between the parties two attached electronic funds transfers ("EFTs") representing the 5th hire payment were released in the total sum of $323,623.69. This was slightly more than the sum claimed at para 18H of the Amended Complaint plus interest. San Juan agreed to reduce the amount secured under the Rule B attachment and its total claim for interest in proportion to the sum released.

12.     San Juan has refused to reduce its "costs" claim of $475,000 despite the consensual reduction of the principal claim by 17 percent.

### D.      ENGLISH LAW AS IT RELATES TO ACCRUAL OF A CAUSE OF ACTION FOR INDEMNITY

#### 1.      Under English Common Law

13.     Under English common law, the cause of action will only accrue, upon a contract to indemnify a person against a liability to a third party, when the plaintiff has

made payment to the third party and <u>not</u> upon the happening of the event that gives

rise to the indemnity.  <u>See</u>, <u>Reynolds v. Doyle</u>, (1849) 1 M&G 753.

2.    <b><u>Express And Implied Indemnity Under A Contract</u></b>

14.    In the absence of an express contract for indemnity providing otherwise,

a cause of action for indemnity only accrues when liability to a third party is

determined and that liability is discharged by way of settlement or payment of an

award or judgment.

15.    As stated in the leading treatise <u>Chitty on Contract</u> Vol. 1, ¶ 28-049, the

pertinent pages of which are Exhibit 4 hereto, in respect of these propositions:

> **Indemnity against Liability.**    Where a contract of
> indemnity is to indemnify a person against liability to a
> third party (eg under a liability insurance policy), the
> general modern rule is that the limitation period starts to
> run when the indemnifying party's liability is established
> by judgment, arbitration or binding settlement.  However,
> that general rule is subject to the construction of the
> contract of indemnity.    This may mean that the
> indemnifying party is liable as soon as the indemnified
> party is liable (that is, even before any establishing of that
> liability by, for example, judgment).  At the other extreme,
> the contract may on its true construction provide that the
> indemnity is conditional on actual payment by the
> indemnified party in which case the cause of action will
> accrue only when such payment has been made.
> [footnotes omitted]

16.    In <u>Telfair Shipping Corp. v. Inersea Carriers S.A. (The "CAROLINE</u>

<u>P")</u>, [1984] 2 Lloyd's Rep. 466 [Q.B. (Com. Ct.)] the Commercial Court considered

the issue of the accrual of a shipowner's claim against a vessel charterer for indemnity

in respect of a cargo receivers' cargo damage claim.

17.    The Court held in material part:

> . . . even if the indemnity is to be construed as an
> indemnity against the incurring of liability such an

indemnity could not have been invoked by the owners until they had incurred some <u>actual</u> liability to the receivers.

<u>Id</u>. at 476 (emphasis in original).

### E.  ENGLISH LAW ON CONSTRUCTION OF THE STATED CAUSE OF ACTION

18.    The English Commercial Court will construe a complaint based on its factual allegations not simply on how the plaintiff chooses to label or plead its cause of action, <u>i.e.</u>, breach of contract or for indemnity.

### F.  APPLICATION OF ENGLISH LAW TO THE INDEMNITY CLAIMS IN THE AMENDED COMPLAINT

19.    I believe that the Indemnity Claims have not accrued, as a matter of English Law, because as far as I am aware, no settlement or payment has been made of them by San Juan to Head Owner.

20.    I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: March 17th, 2008
at Ipswich, England

_____
NICHOLAS WOO

# EXHIBIT B

**"FANY"**

**C/P dd. 8th January 2004**

**OPINION**

1. <u>**Introduction and Background**</u>

1.1    **Documents**

1.1.1    For the purposes of providing my Opinion in this matter, I have been provided with the following documents:

      (1)    SJN's Amended Complaint.

      (2)    A draft Declaration of Nicholas Woo.

      (3)    A copy of an email sent by Chang Sung's lawyers on 20th March 2008 (including attachments) in which they set out their clients' claims (which are, as I understand the position, being passed down the charterparty chain as described above).

1.1.2    I have considered these documents in detail for the purpose of setting out my views in this Opinion.

1.2    **The Charterparty**

1.2.1    By a charterparty dated 8th January 2008 ("the Charterparty"), Trans Power Company Limited ("Trans Power") of Mauritius agreed to hire the above-named vessel ("the Vessel") and San Juan Navigation of Singapore ("SJN") agreed to let the same on terms recorded in a fixture recap dated 8th January 2008 ("the Recap") for "*1 TCT always via SPS SBS SAS AA AWIWL with nickel ore in bulk via Indonesia to China...DUR - abt 25 days (Singapore-*

1

*Waigeo-Yangpu: 6 days ballast + 6-7 days loading - 6 days laden + 3 days discharging)".*

1.2.2  The Recap provides that the fixture is "*as per ows btb cp mv Fany/San Juan Navigation cp with logical amendment*".   The "*cp mv Fany/San Juan Navigation cp*" to which the Recap refers is that between Hanjin Shipping Co Ltd ("Hanjin") as disponent owners and SJN as charterers ("the Hanjin Charterparty"). This is on an amended NYPE 1946 form.

1.2.3  The Charterparty contains *inter alia* the following terms:

**Clause 4**

"......*hire to continue until the time of the day of her re-delivery......in like good order and condition, ordinary wear and tear excepted...*"

**Clause 8**

"...*The Captain (although appointed by the Owners), shall be under the orders and directions of the Charterers as regards vessel's employment and agency: and Charterers are to load, stow, and trim, secure tally and discharge and lash/unlash and dunnage the cargo at their expense under the supervision of the Captain...*"

**Clause 15**

"*That in the event of the loss of time from deficiency...breakdown or damages to hull, and machinery or equipment...or by any other cause whatsoever for which Owners are found liable under the terms of this Charter Party and unless caused by Charterers preventing the full working of the vessel, the payment of hire shall cease for the actual time thereby lost.*"

**Clause 22**

"*Owners shall maintain the gear of the ship as fitted...in accordance with description clause...If vessel is fitted with cranes capable of handling heavier lifts, Owners are to provide necessary gear for same, otherwise equipment and gear for heavier lifts shall be for Charterers' account.*"

2

**Clause 42 - Master/Crew Assistance**

"...3. Supervision of loading and/or discharging..."

**Clause 46 - Stevedore damage**

"*Should any damages be caused to the vessel or her fittings by the Charterers or their stevedores, the master and/or the owners shall do the following:*

*1. Give written notice to the Charterers...of full particulars of the damage caused, and the party allegedly responsible for the damage. Such notice to be given not later than 24 (twenty-four) hours after the damage has occurred...*

*2. Give written notice to the party allegedly responsible, giving full particulars of the damage and its alleged cause...*

*It is expressly agreed and understood by Owners that the purpose of compliance of Owners' and master's obligations in this clause is to preserve the Charterers' right of recourse against the party allegedly responsible, and if the Owners and/or master fail to comply with their obligations under this clause, the Charterers shall not be responsible to Owners for any such damage...*

*...Any stevedore damage affecting the vessels seaworthiness or the proper working of the Vessel and/or her equipment, shall be repaired without delay to the Vessel after each occurrence in the Charterers' time, risk and shall be paid for by the Charterers before sailing from the port".*

**Clause 53 - Vessel's Description**

"...*Cranes: 4 Electric hydraulic driven single deck cranes at 30 tons...Vessel has no crane operators on board. If grabs attached to Cranes then the weight of grab and cargo not to exceed 80% of the described safe working load of cranes under normal duty cycle of crane operation...*

*...Vessel's grabs to be de-rated in keeping with density/stowage of cargo and SWL of Cranes under grab operation but the minimum size is 8 CBM. Owners make no representation of grab load/discharge rate using vessel's grabs and Charterers to follow directives of Master to avoid any overheating of grabs otherwise Charterers to be responsible for hydraulic motors*"

**Clause 82 - BIMCO Double Banking Clause**

*"(a)    The Charterers shall have the right, where and when it is customary and safe for vessels of similar size and type to do so, to order the vessel to go, lie or remain alongside another vessel or vessels of any size, description whatsoever or to order such vessels to come and remain alongside at such safe dock, wharf, anchorage or other place for transhipment, loading or discharging of cargo and/or bunkering.*

*(b)    The Charterers shall pay for and provide such assistance and equipment as may be required to enable any of the operations mentioned in this clause safely to be completed and shall give the Owners such advance notice as they reasonably can of the details of any such operations.*

*(c)    Without prejudice to the generality of the Charterers' rights under (a) and (b), it is expressly agreed that the Master shall have the right to refuse to allow the Vessel to perform as provided in (a) and (b) if in his reasonable opinion it is not safe so to do.*

*(d)    The Owner shall be entitled to insure any deductible under the Vessel's hull policy and the Charterers shall reimburse the Owners any additional premium(s) required by the Vessel's Underwriters and/or the cost of insuring any deductible under the Vessel's hull policy.*

*(e)    The Charterers shall further indemnify the Owners for any costs, damage and liabilities resulting from such operation. The Vessel shall remain on hire for any time lost including periods for repairs as a result of such operation."*

1.2.4    The Charterparty was expressly governed by English law and provided that all disputes arising thereunder were to be resolved by London arbitration.

## 1.3    **The respective parties and the charterparty chain**

1.3.1    The Head Owners of the vessel are Chang Sung Shipping Co Ltd of Seoul ("Chang Sung"). As I understand the position, Chang Sung let the Vessel to Hanjin by means of time charterparty, and Hanjin in turn let the Vessel to SJN by means of the Hanjin Charterparty.

1.3.2  SJN contend (as I understand it) that all charterparties in the chain are "back-to-back" so far as the relevant terms are concerned. However, neither I nor (as I understand it) my Instructing Solicitors have seen any of the charterparties above the Charterparty in the chain.

1.4  **The disputes between SJN and Trans Power**

1.4.1  Various disputes have arisen between SJN and Trans Power. In particular, SJN contend that Trans Power are responsible for the consequences of the collapse of a crane on board the Vessel on 15th January 2008 while the Vessel was loading at Waigeo anchorage in Indonesia ("the Crane Damage"). They also contend that Trans Power are responsible for alleged damage to the Vessel's hull alleged to be the result of contact with barges carrying the cargo to be loaded on board the Vessel ("the Hull Damage"). These are the claims identified in paragraphs 18A and 18B of SJN's Amended Verified Complaint before the United States District Court (Southern District of New York) ("the Complaint").

1.4.2  SJN's claims in respect of the Crane Damage and the Hull Damage include a claim in respect of the value of the time spent (following redelivery by Trans Power under the Charterparty) steaming to a repair yard and in repairing the vessel. These are the claims identified in paragraphs 18C and 18D of the Complaint.

1.4.3  As I understand the position, SJN's stated losses in paragraphs 18A to 18D of the Complaint in fact comprise of an (as yet undetermined) exposure to a liability in respect of sums claimed against them by Hanjin (who, in turn, as I understand it, face a similar claim from Chang Sung), as opposed to losses suffered directly by SJN themselves.

1.4.4  SJN also advance other claims (i.e. those set out in paragraphs 18E, 18F, 18G, and 18H of the Complaint). As I understand the position, each of these claims is a "direct" claim, insofar as it represents a loss which SJN contends to have suffered directly itself (i.e. the claim is not one which is simply passed down

5

the charterparty chain, and which can only stand in the event that SJN is found to owe a corresponding liability to a third party). However, I also understand that Trans Power intends to challenge any right on the part of SJN to maintain security in respect of these claims, albeit for reasons unrelated to those upon which I am asked to advise in relation to the claims identified in paragraphs 18A to 18D of the Complaint.

1.4.5   As matters stand, SJN's claims are described in their Complaint as relating to losses which they "have suffered" and "will suffer", those latter losses being quantified "as nearly as can be estimated at this time". As I understand it, the losses which SJN claim that they "have suffered" are those identified in paragraphs 18E to 18H of the Complaint, while those which SJN claim that they "will suffer" are those identified in paragraphs 18A to 18D of the Complaint. This appears to confirm the contingent nature of the latter claims ("the Indemnity Claims").

## 1.5   **The background to the Indemnity Claims of SJN**

1.5.1   SJN's claims against Trans Power are (as I understand them) brought (necessarily) only in their capacity as disponent owners under the Charterparty. Accordingly, and as is clear from the matters stated above, while SJN may be entitled to claim for damages from Trans Power, such a claim can not result in an award of substantial (as opposed to nominal) damages, because SJN had no proprietorial interest in the Vessel (in other words, SJN suffer no direct loss as a result of damage to the Vessel; such direct loss is suffered only by the party having the relevant proprietorial interest, i.e. Chang Sung, the head owners).

1.5.2   It follows that, to the extent that SJN are able to maintain any claim against Trans Power in respect of the damage to the Vessel, such a claim can (necessarily) take only two forms:

(1)     A claim for damages in respect of any loss suffered as a result of any relevant breach by Trans Power of the Charterparty.

6

     (2)     A claim for an indemnity (pursuant to any relevant provision of the Charterparty) in respect of any liability owed by SJN to a third party.

1.5.3   As far as these two categories of claim are concerned, neither can result in a substantial (as opposed to trivial or nominal) recovery by SJN against Trans Power unless SJN is able in the first instance to prove that it has suffered a corresponding substantial loss. In this regard:

     (1)     As concerns a claim for damages, and given that SJN can have suffered no direct loss as a result of any breach by Trans Power, SJN will need to establish in the first instance that it has suffered some indirect loss (in the form of an actual - i.e. confirmed and quantified - liability to a third party) which is recoverable as damages.

     (2)     As concerns a claim for an indemnity, SJN can (as a matter of common sense) recover no enforceable monetary award unless and until it has incurred a quantified liability to a third party to which the claimed indemnity can relate.

1.5.4   The same principle applies with respect to any claim by SJN in respect of losses allegedly incurred in connection with loss of time following redelivery. As I understand those claims (i.e. those identified in paragraphs 18C and 18D of the Complaint), they represent simply a potential liability which SJN may be found to owe to Hanjin; in other words, they do not represent a direct loss as a result of any breach by Trans Power. It follows that, just as with the claims in respect of damage to the Vessel:

     (1)     As concerns a claim for damages, SJN will need to establish in the first instance that it has suffered some indirect loss (in the form of an actual - i.e. confirmed and quantified - liability to a third party) which is recoverable as damages.

(2)    As concerns a claim for an indemnity, SJN can recover no enforceable monetary award unless and until it has incurred a quantified liability to a third party to which the claimed indemnity can relate.

1.5.5   In this regard, and as I have set out above, claims are being passed down the charterparty chain from Chang Sung to Hanjijn, from Hanjijn to SJN, and from SJN to Trans Power. However, as matters stand, no party has actually incurred a quantified liability by way of either judgment/arbitral award or compromise of any claim. Accordingly, as far as the Indemnity Claims are concerned, all questions of liability and loss remain inchoate.

## 1.6    SJN's attempts to obtain security for the claims against Trans Power

1.6.1   As I understand the position, SJN has, by means of the "Rule B attachment" procedure available in the U.S., sought to obtain security from Trans Power in respect of its claims as described above.

1.6.2   It would appear that this attachment has already had the effect of freezing certain US Dollar funds which are due to Trans Power.

## 1.7    Instructions

1.7.1   Against the backdrop of the matters stated above, I am asked to advise as to whether, from the perspective of English law, SJN has as matters stand any accrued right which might give rise to an entitlement to security.

1.7.2   I set out below my opinion in this regard.

8

2.     **The Indemnity Claims**

2.1    **The general principles under English law**

2.1.1  As with most common law legal systems, English law commonly provides for
       two means of recovering loss under a contract in circumstances where the loss
       is indirect (i.e. where it is not a loss suffered directly by the innocent party, but
       is a loss which comprises of a liability owed by the innocent party to a third
       party as a result of the conduct of the other (wrongdoing) party):

       (1)    A claim for damages in the amount of the liability owed to the third
              party (frequently referred to as a claim for indemnity by way of
              damages).

       (2)    A claim for an indemnity in respect of the said liability.

2.1.2  However, it is a fundamental requirement of any such claim (and, indeed, of
       common sense) that, if enforceable monetary relief is to be awarded, the
       innocent party must demonstrate that it has actually incurred the liability
       which forms the basis of (and quantifies) the corresponding award of damages
       or indemnity. Without such a crystallised liability (either by way of judgment,
       arbitral award, or reasonable compromise) to the relevant third party, the claim
       of the innocent party remains contingent, and unliquidated.

2.1.3  As a result, where the innocent party has not yet actually incurred the relevant
       liability to the third party, two options remain open to it:

       (1)    It may bring a claim for breach of contract and, in the absence of proof
              of any actual liability by which damages for that breach may be
              quantified, proceed to recover nominal damages (see, for example,
              Grobelaar v News Group Newspapers  Ltd [2002] 1 WLR 3024)
              together with (as necessary) declaratory relief to the effect that it is

9

entitled to substantial damages in the event that the relevant liability is actually incurred in due course (see, for example, Household Machines v Cosmos Exporters [1947] 1 KB 217).

(2)     It may bring a claim for declaratory relief to the effect that it is entitled to an indemnity in the amount of the liability in the event (again) that the relevant liability is actually incurred in due course (see, for example, Trans Trust SPRL v Danubian Trading Co. [1952] 2 Q.B. 297).

2.1.4   Perhaps self-evidently, a claim for declaratory relief (see (2) above) has no monetary value, and a judgment or award which provides only for a declaration cannot be enforced against any given security - the relief merely comprises of a statement by the Court or tribunal to the effect that, in specified circumstances, the claimant will be entitled to certain substantive financial relief as opposed to an award to the effect that the claimants are entitled to the actual substantive relief in the first instance.

2.1.5   At the same time, while a claim for nominal damages (see (1) above) may well, in principle, give rise to an enforceable judgment or award, the amount of that judgment or award will be trivial (a claim for nominal damages has a trivial value; an award of £5 is common, although up to £50 has been awarded; however, in Grobelaar v News Group Newspapers Ltd [2002] 1 WLR 3024 the House of Lords awarded a sum of only £1 - see paragraph 10-006 of the leading treatise on the English law of damages, *McGregor on Damages*) and, for that reason, not appropriate for enforcement.

2.1.6   All of this is a reflection of a well-established principle to the effect that, under English law, a cause of action will only accrue upon a contract or any other obligation to indemnify a person against a liability to a third party when the claimant has made payment to (and thereby discharged any liability to) the third party and not upon the happening of the event that gives rise to the

10

indemnity (see *Chitty on Contracts* Vol. 1, paragraph 28-049; <u>Reynolds v.</u> <u>Doyle</u> (1849) 1 M&G 753; <u>The Caroline P</u> [1984] 2 Lloyd's Rep. 466).

## 2.2    The present case: SJN's claims

2.2.1    Against the background set out above, unless and until SJN actually incurs (and, properly analysed, discharges) a liability to a third party in respect of the matters identified in paragraphs 18A to 18D of the Complaint, it will not be able to obtain an award from a London arbitration tribunal for substantive (i.e. other than declaratory) or substantial (i.e. other than nominal or trivial) relief.

2.2.2    I consider below the effect of this upon any claim which SJN may make as to security in respect of the claims identified in paragraphs 18A to 18D of the Complaint.

## 3.    The right to security for the "Indemnity Claims"

3.1    As a matter of English law, security (whether by means of arrest in order to enforce a statutory lien under s. 20 of the Supreme Court Act 1981, by way of a freezing order, or otherwise) can only be obtained in circumstances where the claim in respect of which security is sought has monetary value and can therefore be enforced against any given security once it has reached the stage of a final judgment or award (see <u>The Siskina</u> [1978] 1 Lloyds Rep 1; see also the discussion in C <u>Inc. Plc v L & Another</u> [2001] 2 Lloyd's Rep. 459).

3.2    It follows that, where the only cause of action in existence at the time of any application for security is one which (if the court or tribunal were to make a judgment or award in the claimant's favour) would result only in nominal damages or declaratory relief, substantial security can not, should not and, therefore, will not be ordered as a matter of English law. This is for the simple (and self-evident) reason that the party seeking security can not demonstrate that he is entitled to any form of relief which could be enforced against security (either in a substantial amount, or at all).

11

3.3     Thus, in my opinion, and as matters stand with regard to the claims identified by SJN in paragraphs 18A to 18D of the Complaint, SJN are not (as a matter of English law) entitled to substantial (i.e. more than nominal or trivial) security because, at their highest, the claims which are contended to give rise to the entitlement to security are unliquidated and inchoate and can, for that reason, give rise only to declaratory relief or nominal damages.

4.      **Summary of conclusions**

4.1     In light of my comments above, my conclusions are as follows:

  (1)   As a matter of English law, SJN's claims as identified in paragraphs 18A to 18D of the Complaint can, at present, give rise only to relief by way of nominal damages or declaratory relief.

  (2)   Such relief is not enforceable against substantial security.

  (3)   Accordingly, there is no justification or legal basis in English law for ordering the provision of security in respect of such claims.

  (4)   It follows that SJN are not, as a matter of English law, entitled to security in respect of their claims in their present form.

  (5)   SJN will be entitled to security (in principle) in respect of the said claims only once they have actually incurred (and, properly speaking, discharged) the liability to the third party which underlies the claims.

4.2     I trust that this Advice assists. However, if Instructing Solicitors have any queries arising from it, or if I may be of any further assistance in this matter, they should not hesitate to contact me in Chambers.

12

**Quadrant Chambers**
**10 Fleet Street**
**London**
**EC4Y 1AU**

**Nevil Phillips**

**27th March 2008**