FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD.
80 Pine Street
New York, NY 10005
Telephone: (212) 425-1900 / Fax: (212) 425-1900
Eric E. Lenck (EL 4547)
Manuel A. Molina (MM 1017)

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x

SAN JUAN NAVIGATION (SINGAPORE)
PTE. LTD.,

                                                                    **08 CIV 1762 (RMB)**

                    Plaintiff,

          - against -

TRANS POWER CO., LTD.,

                    Defendant.

------------------------------------------------------------x

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO VACATE OR REDUCE ATTACHMENT, OR ALTERNATIVELY, FOR COUNTERSECURITY

FREEHILL HOGAN & MAHAR, LLP
Attorneys for Plaintiff
80 Pine Street, 24th floor
New York, New York 10005
(212) 425-1900

Eric E. Lenck
Manuel A. Molina
  Of Counsel

NYDOCS1/303080.1

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...........................................................    ii

BACKGROUND FACTS ...........................................................    1

ARGUMENT.......................................................................    1

### POINT I

SAN JUAN HAS MET ITS BURDEN TO SHOW WHY THE ATTACHMENT
SHOULD BE MAINTAINED...........................................................    1

### POINT II

SAN JUAN'S CLAIMS ARE FOR BREACH OF CONTRACT WHICH,
UNDER ENGLISH LAW, HAVE ALREADY ACCRUED ..............................    2

    A.    San Juan's Claims are Direct Breach of Contract Claims.....................    3

    B.    The Cause of Action for Breach of Contract Accrues
at the Time of Breach...............................................................    4

    C    Under English Law, San Juan May Seek Security for
A Claim that Remains Unquantified ...........................................    8

    D.    The Lien Claims ...................................................................    9

    E.    The Costs Figure ...................................................................    10

### POINT III

IN ITS EXERCISE OF ITS DISCRETION, THIS COURT SHOULD
MAINTAIN THE ATTACHMENTS.................................................    6

### POINT IV

TRANS POWER CANNOT BE FOUND IN THE DISTRICT FOR
PURPOSES OF THE SECOND AMENDED VERIFIED COMPLAINT............    16

    A.    The Amendments Relate Back to the Date of the Originally
Filed Complaint .....................................................................    16

    B.    Trans Power Has Created an Illusory Presence in the District.................    20

## **POINT V**

TRANS POWER'S CLAIM FOR COSTS OF DEFENDING THE
ARBITRATION COMMENCED BY SAN JUAN IS NOT A
COUNTERCLAIM WITHIN THE PURVIEW OF RULE E(7).........................22


CONCLUSION ........……………………………………………………………........... 23

# TABLE OF AUTHORITIES

## Cases

*Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.,*
460 F.3d 434 (2d Cir. 2006)................................................................................. 1

*Bottiglieri di Navigazione, Spa v. Tradekube LLC,*
472 F. Supp. 2d 588 (S.D.N.Y. 2007)................................................. 6, 7, 8, 15

*Caribbean Yacht Works, Ltd. v. NEENAH Z,*
410 F. Supp. 2d 1261 (S.D.Fla. 2005) ........................................................ 17

*Centauri Shipping Ltd. v. Western Bulk Carriers KS,*
528 F. Supp. 2d 186 (S.D.N.Y. 2007) ................................................... 21, 22

*Constr. Exp. Enterps., Uneca v. Nikki Maritime Ltd.,*
558 F. Supp. 1372 (S.D.N.Y. 1984) ......................................... 17, 18, 19, 20

*Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.,*
No. 05-7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005).................................. 13, 14

*Dolco Inves. Ltd. v. Moonriver Dev. Ltd.,*
486 F. Supp. 2d 261 ( S.D.N.Y. 2007)................................................................. 1

*Eitzen Sealift A.S. v. Cementos Andinos Dominicanos, S.A.,*
No. 05-4550, 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y. Sept. 9, 2005)...................................... 14

*Erne Shipping, Inc. v. HBC Hamburg Bulk Carriers GmbH,*
409 F. Supp. 2d 427 (S.D.N.Y. 2006) ................................................... 20, 21

*Greenwich Marine, Inc. v. S.S. Alexandra,*
339 F.2d 901 (2d Cir. 1965)................................................................. 10

*Heidmar Inc. v. Anonima Ravennate di Armamento Spa of Ravenna,*
132 F. 3d 264, (5th 1998)........................................................................... 17, 18, 19

*J.K. Int'l Pty. Ltd v. Agriko S.A.S.,*
No. 06-13259, 2007 U.S. LEXIS 10074, 15 (S.D.N.Y. Feb. 13, 2007)...........................15

*Med-Asia Shipping Ltd. v. Cosco Beijing Int'l Freight Co., Ltd.,*
No. 07-9624 (S.D.N.Y. April 2, 2008) ...........................................................22

*Navalmar (U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.,*
485 F. Supp. 2d 399 (S.D.N.Y. 2007)................................................................. 12

*Ronda Ship Management Inc. v. Doha Asian Games Organising Committee,*
511 F. Supp. 2d 399 (S.D.N.Y. 2007)................................................................. 2

*Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd.,*
478 F. Supp. 2d 532 (S.D.N.Y. 2007)............................................................................. 2,3, 12, 15

*Staronset Shipping Ltd. v. North Star Navigation Inc.,*
659 F. Supp. 189 (S.D.N.Y. 1987) ........................................................................... 10, 13

*T&O Shipping Ltd. v. Lydia Mar Shipping Co., S.A.,*
 415 F. Supp. 2d 310 (S.D.N.Y. 2006)................................................................................ 3, 10

*Telfare Shipping Corps v. Inersea Carriers, S.A.,*
 (the "CAROLINE P") [1984] 2 Lloyd's Rep. 466 (2.B) Com. Ct.) .............................................. 4

*Tide Line, Inc. v. Eastrade Commodities, Inc.,*
No. 06-1979, 2006 U.S. Dist. LEXIS 95870 (S.D.NY. Aug. 15, 2006)...................................... 1, 2

*Transportes Navieros y Terrestres, S.A. de C.V. v. Fairmount Heavy Transport N.V.,*
No. 07-3076, 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007) ........................................ 1,2

*World Reach Shipping Ltd. v. Industrial Carriers, Inc.,*
No. 06-3756, 2006 U.S. Dist. LEXIS 83224  (S.D.N.Y. Nov. 9, 2006).........................19

Plaintiff SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD. ("San Juan"), by and through its counsel Freehill Hogan & Mahar, LLP, hereby submits this Memorandum of Law in opposition to the Motion of Defendant TRANS POWER CO. LTD. ( "Trans Power") to vacate or reduce the attachment or alternatively for countersecurity.

### BACKGROUND FACTS

For the facts relevant to the adjudication of Trans Power's motion, San Juan respectfully draws the Court's attention the Declaration of Gerard Anthony Hopkins, dated April 18, 2008 ("Hopkins Decl.").

### ARGUMENT

### POINT I

### SAN JUAN HAS MET ITS BURDEN TO SHOW WHY THE ATTACHMENT SHOULD BE MAINTAINED

To sustain its burden and defeat a motion to vacate, Plaintiff need only demonstrate that: (1) the cause of action arises within the Court's admiralty jurisdiction; (2) the Defendant cannot be found within the District; and (3) the Defendant has property within this District. *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty. Ltd.*, 460 F.3d 434 (2d Cir. 2006).

Although the *Aqua Stoli* Court did not exactly state what a Plaintiff must show to meet this burden, Courts of this District have adopted a *prima facie* standard. *Tide Line, Inc. v. Eastrade Commodities, Inc.*, No. 06-1979, 2006 U.S. Dist. LEXIS 95870 (S.D.NY. Aug. 15, 2006); *Transportes Navieros y Terrestres, S.A. de C.V. v. Fairmount Heavy Transport N.V.*, No. 07-3076, 2007 U.S. Dist. LEXIS 50260 (S.D.N.Y. July 6, 2007); *Dolco Inves. Ltd. v. Moonriver Dev. Ltd.*, 486 F. Supp. 2d 261, 266 (S.D.N.Y. 2007). Under this *prima facie* standard, a Rule E(4)(f) hearing is not intended to, and should not, be a fact-intensive inquiry into the underlying merits of Plaintiff's claim (especially where the dispute is subject to arbitration). All that the

Plaintiff needs to defeat a Rule E(4)(f) Motion to vacate is a proper Verified Complaint. *Tide Line*, 2006 U.S. Dist. LEXIS 95870, *15-16; *Transportes Navieros*, 2007 U.S. Dist. LEXIS 50260, *11.

> As Chief Judge Wood has stated:

> Thus to show that it has a *prima facie* claim, a Plaintiff need not provide any supporting evidence; its Complaint should suffice. Furthermore *Aqua Stoli* implies that a Plaintiff is likewise not required to provide evidence showing that it has a claim against Defendant to carry its burden under Supplemental Rule E(4)(f).

2006 U.S. Dist. LEXIS 95870, *15-16 (emphasis supplied); *Ronda Ship Management Inc. v. Doha Asian Games Organising Committee*, 511 F. Supp. 2d 399, 403-04 (S.D.N.Y. 2007) (under the prima facie pleading standard, "the Court ***looks only to the Complaint*** to determine whether the Plaintiff has alleged a valid admiralty claim against the Defendant").

San Juan respectfully submits that a review of its Second Amended Verified Complaint (and the original Verified Complain and Amended Verified Complaint for that matter) demonstrates that it has satisfied all technical requirements mandated by Rule B. (Affidavit of Manuel A. Molina, dated April 18, 2008 ("Molina Aff.") Exs. A-C). Accordingly, the attachments are valid and should be maintained.

### POINT II

### SAN JUAN'S CLAIMS ARE FOR BREACH OF CONTRACT WHICH, UNDER ENGLISH LAW, HAVE ALREADY ACCRUED

There is no dispute between the parties that the legal precedents in this District establish that the question of whether a party has asserted a valid admiralty claim within the ambit of Rule B must be decided under the law of the of the maritime contract relied upon by the party, which in this case is English law. *Sonito Shipping Co. Ltd. v. Sun United Maritime Ltd.*, 478 F. Supp.

2d 532 (S.D.N.Y. 2007); *T&O Shipping Ltd. v. Lydia Mar Shipping Co., S.A.*, 415 F. Supp. 2d

310 (S.D.N.Y. 2006). Judge Haight has clearly stated this rule as follows:

> The existence *vel non* of a valid maritime claim for purposes of a Rule B writ of attachment turns upon the applicable substantive law, <u>in this case the law of the contract</u>. (Emphasis Added).

*Sonito*, 478 F. Supp. 2d at 543. As set forth below, under English law, all of San Juan's claims

against Trans Power accrued prior to the commencement of this Rule B attachment action. San

Juan therefore has properly asserted valid *prima facie* admiralty claims for purposes of Rule B.


**A. San Juan's Claims Are Direct Breach of Contract Claims**

As the Declaration of Solicitor Hopkins and the opinion of Barrister Timothy Young

establish, all of the claims that San Juan has asserted against Trans Power for the crane and hull

damages are claims for breaches of the maritime charter party contract that exists between San

Juan and Trans Power. (Hopkins Decl., ¶52; Opinion of Mr. Young, dated April 17, 2008

("Young Op."), ¶5).

More specifically, as stated by Mr. Hopkins, the damages being asserted by San Juan

against Trans Power flow directly from Trans Power's breach of various charter party provisions

including: (a) the safe port, safe berth warranty (lines 14-17 of the charter party and Clause 8);

(b) Clause 4 which imposes upon Trans Power the obligation to pay use and hire for the vessel

and to redeliver the vessel in good order and condition; and (c) Clauses 8 and 46 which

additionally impose liability upon Trans Power for any damage caused to the vessel by

stevedores during the loading operations. (Hopkins Decl., ¶¶28-34, 59). Accordingly, Trans

Power's assertion that San Juan's claims are for "indemnity" is a mischaracterization of those

claims. Such mischaracterization, in effort to avoid the Order of Attachment that was properly

issued in this action, should be rejected by this Court.

**B. The Cause of Action for Breach of Contract Accrues at the Time of Breach**

Under English law, the cause of action for breach of contract accrues when the breach

occurs, regardless of the occurrence of damage. (Young Op., ¶6); Hopkins Decl., ¶48). Indeed,

the principle of English law, which Trans Power itself recognizes, that even if a claimant proves

no loss it may still recover nominal damages, fundamentally demonstrates that the suffering of

damages is not essential to the accrual of the cause of action. (Young Op., ¶8, n.1).

As both Messrs. Hopkins and Young observe, Trans Power's reliance upon English

authorities involving "contracts for indemnity" or "implied indemnity" is misguided and

irrelevant. (Hopkins Decl., ¶¶44-59). Trans Power erroneously assumes that San Juan's claims

sound in indemnity simply because damages remain to be quantified.  As Mr. Young states

concerning the flawed reasoning of Trans Power's expert, Mr. Philips, on this issue:

> The cause of action for an indemnity, strictly speaking such as the right of a
> surety to be indemnified, arises out of a promise to indemnify, but that is not this
> case which is a claim for breach of contract although the damages payable will (in
> part at least) achieve the *effect* of an indemnity. [Mr. Philips] confuses the cause
> of action with the effect.

(Young Op., ¶8; italics in the original).  Trans Power thus confuses two separate issues, namely,

the existence of a cause of action with the evaluation of liability (or proof of damages). (Young

Op., ¶8).  The fact that recoverable damages may not be ascertained until after a breach has

occurred is irrelevant to the accrual and existence of a cause of action for breach of contract.

(Young Op., ¶7).  Indeed, Mr. Young criticizes Mr. Philips for arguing that, under English law,

to the extent that damages (or liability) have not yet been "crystallised" by judgment, arbitral

award or reasonable compromise to the third party, the claim of the aggrieved party against the

breaching party remains "contingent and unliquidated." Mr. Young persuasively counters:

> Those concluding words are, with utmost respect to Mr. Phillips, badly
> misleading if they seek to suggest that there no accrued cause of action. The word
> "contingent" is quite wrong and inappropriate; the cause of action which [San
> Juan] here advance is not founded on a "contingent" liability in any material
> sense. The fact that it is "unliquidated" (whatever he may mean by that term)
> does not mean that the cause of action is not accrued. There is a distinction
> between claims for liquidated damages (such as demurrage) and claims for
> unliquidated damages (that is damages at large which need to be assessed as not
> being liquidated by the parties' contract), but a claim for unliquidated damages
> (which is by far the most common form of contractual claim) is accrued and
> "ripe" before liquidation.

(Young Op., ¶14).

Clearly, Trans Power is obfuscating by erroneously mixing the law of "contracts to

indemnify" with the law of "claims for breach of contract where the damages are intended to

make good by indemnifying the claimant." (Young Op., ¶17(a)). Indeed, "in English law, the

disponent owner's cause of action for vessel damage caused by a subcharterer accrues at the

moment of the breach and is not inchoate or unaccrued until the liability of the disponent owner

to the registered owner has been resolved and determined." (Young Op., ¶11).

Moreover, Messrs. Hopkins and Young also point out that *Telfare Shipping Corps v.

Inersea Carriers, S.A.* (the "*CAROLINE P*") [1984] 2 Lloyd's Rep. 466 (2.B) Com. Ct.)), does

not support Trans Power's position because San Juan' claims are not based on contracts to

indemnify, but rather, on breaches of the charter party contract between San Juan and Trans

Power. (Hopkins Decl., ¶¶46-51). As San Juan's English law experts demonstrate, the

*CAROLINE P* case involved an implied indemnity claim. (Hopkins Decl., ¶¶53-57; Young Op.,

¶17(b)). The *CAROLINE P* Court simply held that a shipowner was entitled, under the common

law, to be indemnified by the charterer for any damages sustained by the shipowner in respect of

a third party cargo claim as a result of the charterer's failure to present to the master the proper bills of lading. (Hopkins Decl., ¶¶53-57 and Ex.H; Young Op., ¶17(b)).

As important, a closer reading of the *CAROLINE P* (which, for obvious reasons, is given mere lip-service by Messrs. Woo and Phillips), [1] demonstrates that the case stands for the proposition that a cause of action, under English law, will accrue at different times depending upon the manner in which the claim is formulated, including alternative legal bases for the same claim:

> Furthermore, it appears that where a person is entitled to rely on an implied indemnity he can make a claim on such an indemnity in addition to making a claim based on some express provision of his contract with the indemnifier or (semble) a claim for damages for breach of contract.

(Hopkins Decl., ¶54; Ex. H).

In the *CAROLINE* P, the shipowner had been found liable to cargo claimants in Iraq. The shipowner sought to recover its losses by bringing arbitration proceedings against charterer. The charterer was found liable and charterer appealed.    Essentially, in the *CAROLINE P*, the shipowner faced a time-bar problem depending on how the claim against the charterer was presented. (Hopkins Decl., ¶¶53-55).    As Mr. Hopkins points out, the *CAROLINE P* Court recognized that the shipowner's claim could be properly formulated as a "breach of contract claim," whose cause of action accrued when the breach occurred, **not** when shipowner was found liable to the cargo claimant in Iraq:

> As a claim on a breach of an implied term of the charter-party, the breach consisting in the presentation of the bills of lading for signature.  On this basis the cause of action arose at the moment of the breach.

---

[1] Indeed, and tellingly, neither Mr. Woo nor Mr. Philips discuss the *CAROLINE P*. Rather, Trans Power  merely quotes extensively Judge Kaplan's decision in *Bottiglieri di Navigazione Spa v. Tradeline LLC*, 472 F. Supp. 2d 588, 590 (S.D.N.Y. 2007). As will be discussed *infra*, Trans Power's reliance upon *Bottiglieri* is misguided.

(Hopkins Decl., ¶54). Mr. Hopkins states that the claim based on a contract claim was time barred by the English Limitation Act 1980, as six years from the accrual of the cause of action had elapsed. (Hopkins Decl., ¶54).

By contrast, the English Court found that the shipowner's claim, when presented as an indemnity claim, would not be time-barred because "the time for the accrual of the Ship Owner's cause of action for an indemnity against the Time Charterers arose at the earliest when the liability of the Ship Owner for the cargo claims had been ascertained by the Iraqi courts." (Hopkins Decl., ¶55).

In short, under the *CAROLINE P*, San Juan's breach of charterparty causes of action against Trans Power accrued at the moment Trans Power breached, and are "ripe" admiralty claims under English law. (Hopkins Decl., ¶59). This is so even though "the precise quantum of the damages remains to be decided in the related arbitration proceedings up the chain of the charter parties." (Hopkins Decl., ¶52; Young Op., ¶¶8, 11, 12, 14, 16-17). San Juan's claims are therefore valid *prima facie* admiralty claims within the purview of Rule B. The attachment of Trans Power's funds was proper and should be maintained.

The *Bottiglieri* decision relied upon by Trans Power is factually inapposite. A close reading of *Bottiglieri* reveals that the allegations contained in the Rule B Plaintiff's Complaint asserted that the Defendant's liability was **contingent** upon the finding of liability of the Rule B Plaintiff to the third party claimant. Indeed, precisely because the plaintiff pled indemnity, Judge Kaplan ruled that plaintiff's claims were "not ripe":

> . . . Plaintiff's claim falls squarely within the Caroline P's [implied indemnity] category. This is ***clear from the allegations of the complaint***, which trace the bulk of the monetary claim made against Defendant to the damages claimed by the Owner ***and state plainly that "Defendant is liable to indemnify Plaintiff for all amounts claimed against it by [the Owner]."*** ***This claim for indemnity*** is not ripe under English law.

*Bottiglieri*, 472 F. Supp. 2d at 591 (emphasis supplied).

Here, as explained by Mr. Hopkins and Mr. Young, San Juan's claims for the crane and hull damages are not based on a contractual promise to indemnify (unlike the complaint in *Bottiglieri* nowhere in fact do San Juan's complaints plead indemnity), but rather, stem from breaches of express, direct contractual obligations contained in the charter party between San Juan and Trans Power. (Molina Aff., Exs. A-C). Under the *Caroline P*, the pleaded formulation of the claim is highly relevant for an English Court's determination whether a cause of action has accrued. (Hopkins Decl., ¶¶54-55, 58). San Juan's claims based on damage to the cranes and hull accrued, under English law, at the time of the complained of breaches occurred. They are therefore valid *prima facie* admiralty claims.

### C. Under English Law, San Juan May Seek Security for a Claim that Remains Unquantified

As Mr. Young persuasively establishes, there is considerable English authority for the proposition that a party in San Juan's position is entitled to seek security for the claims being asserted against Trans Power even if San Juan's recoverable damages cannot be ascertained until later. Mr. Young notes that English courts invariably grant security applications for such claims; he states:

> The court has to be satisfied that there is a "good arguable case" (see The Niedersachsen [1983] 1. W.L.R. 1412) and, here the court would look at the evidence of the proposed claim and the claimant's assessment of the likely claim against him (plust interest and cost) and make an Order reflecting a fair view of that case as being a good arguable case. This is the common experience.

(Young Op., ¶21). Given that San Juan has an extant and accrued cause of action for breach of contract, San Juan would be entitled to obtain security from Trans Power on the underlying

claims even though those claims have not yet been quantified (or the liability incurred). (Young Op., ¶21; Hopkins Decl., ¶2).

Significantly, even in the context of a "pure indemnity claim," English law recognizes that "there is an equitable cause of action for the establishment of a fund by the indemnifier." (Young Op., ¶10). The purpose of this trust being that "in the view of the Court of Equity it was not necessary for the person entitled to the indemnity to be ruined by having to pay the full amount in the first instance. He had full power to take proceedings under which that fate might be averted and he might substantially protect himself and secure his position by coming to the Court." (Young Op., ¶10). Accordingly, as a matter of English law, San Juan is entitled to obtain security from Trans Power even if its actual liability to Hanjin remains to be resolved.

## D. The Lien Claims

Trans Power also asserts that a $376,000 notice of lien on sub-freights served upon Trans Power by Head Owners equates to "security" posted by Trans Power and is a basis for vacating San Juan's attachment of $556,450.80. The argument is frivolous. As Mr. Hopkins states, Trans Power omits to advise the Court that it has not paid Head Owners the sum claimed in the notice of lien. In fact, to this date, Trans Power has made no efforts whatsoever to satisfy that lien, and as can be seen from its argument to this Court, it is merely using the notice of lien as a pretext to pay neither Head Owners nor San Juan. (Hopkins Decl., ¶24). Simply put, Trans Power seeks credit when it has not paid a dime to either party. San Juan is therefore entitled to secure its claim for outstanding hire against Trans Power from the attached assets.

Moreover, Mr. Hopkins observes that before the lien notice was served on Trans Power, Trans Power had already defaulted on a substantial payment of hire ($556,450.80) due to San

Juan. (Hopkins Decl., ¶23). This amount was over and above the amount purportedly covered by the notice of lien and remains unpaid by Trans Power. (Hopkins Decl., ¶25).

### E. The Costs Figure

As Mr. Hopkins demonstrates, San Juan's right to seek security in the sum of $475,000 is reasonable. In fact, Head Owners have endorsed San Juan's estimate of costs. (Hopkins Decl., ¶41).

### POINT III

### IN ITS EXERCISE OF ITS DISCRETION, THIS COURT SHOULD MAINTAIN THE ATTACHMENTS

As Trans Power's own cited authorities demonstrate, it is well-settled that the determination of whether a claim is premature is within the discretion of this Court. *Greenwich Marine, Inc. v. S.S. Alexandra*, 339 F.2d 901, 905 (2d Cir. 1965) ("The inherent power to adapt an admiralty rule to the equities of a particular situation is entrusted to the sound discretion of the district judge sitting as an admiralty judge"); *Staronset Shipping Ltd. v. North Star Navigation Inc.*, 659 F. Supp. 189, 191 (S.D.N.Y. 1987) (relying upon *Greenwich Marine* to hold that the prematurity of a claim is a question "committed to our discretion"); *T&O Shipping, Ltd. v. Lydia Mar Shipping Co., S.A.*, 415 F. Supp. 2d 310, 314 (S.D.N.Y. 2006) ("A court has discretion to allow or disallow a Rule B attachment to secure contingent liabilities"). Thus, even assuming *arguendo* that San Juan's claims were "Indemnity Claims" as alleged by Trans Power (which they are not), San Juan, under the facts of this case is still entitled to maintain the challenged attachments.

The dispositive issue in the Court's analysis, as a review of the pertinent jurisprudence discloses, is whether the indemnity claim is too remote or speculative to provide a Plaintiff with

a reasonable belief that it will ultimately face liability. Indeed, there is a plethora of decisions in this district (beyond the single authority recognized by Trans Power in its brief) that have ignored the prematurity ("unripeness") of an indemnity claim when there is support on the record demonstrating that the potential for liability is real, not imagined. San Juan respectfully submits that even if the Court were to find its claims to be premature, the Court should nevertheless exercise its discretion and maintain the attachments, as the equities in this case tip decisively in San Juan's favor.

Mr. Hopkins points out that on February 29, 2008, San Juan received notice of commencement of arbitration proceedings from the vessel's disponent owners, Hanjin Shipping Co. Ltd. Further, the vessel's Head Owners have also indicated their intention hold San Juan and Trans Power liable for all damages sustained by the vessel. Also, upon receipt of Hanjin's arbitration notice, San Juan demanded, in turn, arbitration against Trans Power. Importantly, Hanjin will provide to Head Owners on April 21, 2008, security in the sum of $3,815,000, in the form of a letter of undertaking to be given by Hanjin's P&I Club Britannia. (Hopkins Decl., ¶¶64-65). This Club Letter will secure Head Owner's claims against Hanjin. San Juan, in turn, will provide security to Hanjin, in the sum of $3,993,678.46, in the form of a Club Letter from San Juan's P&I Club, the West of England, for the claims Hanjin has asserted against San Juan. (Hopkins Decl., ¶66). The Club Letter will be provided to Hanjin the week of April 21, 2008, when the relevant director of the Club returns to his office. (Hopkins Decl., ¶66, Ex. K). By contrast, except for the attachments in this case, Trans Power has not secured the claims San Juan has asserted against it. Under the applicable law, the above facts demonstrate that San Juan's claims are not remote or speculative, but real and concrete, and that accordingly, the Court should exercise its discretion and allow San Juan to maintain the attachments.

Powerfully illustrating the point that the posting of security is crucial in a court's decision

to disregard the prematurity of an indemnity claim is Judge Hellerstein's decision in *Navalmar*

*(U.K.) Ltd. v. Welspun Gujarat Stahl Rohren, Ltd.*, 485 F. Supp. 2d 399 (S.D.N.Y. 2007). There,

the Rule B plaintiff-shipowner brought an indemnity claim (a third party cargo claim subject to

the Inter-Club Agreement ("ICA") against the defendant-charterer).[2] Following attachment of its

funds, the defendant moved to vacate the attachment arguing that plaintiff's indemnity claim had

not yet accrued because neither the Yemen Court, where the cargo owners brought a claim

against the plaintiff, nor the London arbitration proceedings between the parties, had decided the

issue of liability. As a result, the defendant argued that the indemnity claim was premature and

not a valid *prima facie* admiralty claim. In *Navalmar*, however, the plaintiff's vessel had been

arrested in Yemen by the cargo claimants and in order to effect the vessel's release plaintiff was

compelled to post a bank guarantee with the Aden Commercial Court. Judge Hellerstein ruled

that the posting of security by the shipowner was sufficient to disregard the prematurity of the

indemnity claim:

> I find in the case before me that plaintiff Nalvalmar's claim in the London
> arbitration for indemnity against WGSR, the charterer, states a *prima facie*
> admiralty claim. Navalmar, having been required to file a million dollar bank
> guarantee in the Aden Commercial Court, to secure the consignee of the goods for
> damaged cargo during an ocean voyage aboard the M/V PATARA while it was
> chartered to WGSR, has a direct interest in securing its claim for indemnity
> against WGSR. In effect, Navalmar has had to prepay a debt owed by it or
> WGSR, as may be determined, and should have the right by attachment to secure
> its claim against WGSR for indemnity, just as the consignee of the goods gained
> security Navalmar by arresting the vessel owned by Navalmar. The entire point
> of an attachment, as provisional remedy before trial, is to secure a plaintiff's
> claim before it can be adjudicated. In a world of shifting assets, numerous thinly-

---

[2] "The ICA is a well-known, long established agreement among property and indemnity clubs of shipowners and charterers to provide insurance against maritime risks and to apportion liability fro claims of cargo damage arising under charter parties." 485 F. Supp. at 405. In *Sonito Shipping*, Judge Haight held that, under English law, a cargo claim subject to the ICA did not accrue until the cargo claim had been paid. Accordingly, an unpaid cargo claim did set forth a valid *prima facie* admiralty claim within the purview of Rule B. 478 F. Supp. at 543. It should be noted that San Juan's claims against Trans Power are **not** subject to the ICA, and hence *Sonito Shipping* is inapplicable. Thus the posting of security in this case is far more compelling than in *Navalmar*.

capitalized subsidiaries, flags of convenience and flows of currencies, maritime attachments have particular importance.

485 F. Supp. 2d at 404. Here, Hanjin will provide $3.8 million in security to Head Owners, San Juan, in turn, will provide Hanjin security in the sum of $3.4 million. San Juan should thus have the right to secure its claims against Trans Power. The fact that Trans Power has not voluntarily provided similar security to San Juan, and thus remains the only entity under the chain of charter parties that has refused to post security, belies Trans Power's position. San Juan's entitlement to security from Trans Power is all the more compelling under the circumstances of the case, since the complained of damages to the M/V FANY occurred while the vessel was under the command and operation of Trans Power.

In *Staronset,* a stevedore brought a claim in Federal Court against the shipowner and arrested the vessel. The owner posted security to obtain the vessel's release. The shipowner subsequently applied for a Rule B attachment against charterer and successfully restrained charterer's assets. Charterer moved to vacate on the same ground advanced here by Trans Power that owner's claim was premature. In denying charterer's Motion, Judge Knapp stated:

> The charterer also argues that the attachment should be vacated on the ground that the instant action is premature, since no cause of action will arise until such time, if ever, as the ship owner incurs liability. . . . In the exercise of our discretion, _**we believe that the ship owner's concerns are reasonable and that he is entitled to the security which he seeks**_.

659 F. Supp. at 190 (emphasis supplied).

Similarly, in *Daeshin Shipping Co. Ltd. v. Meridian Bulk Carriers, Ltd.*, No. 05-7173, 2005 U.S. Dist. LEXIS 22409 (S.D.N.Y. Oct. 3, 2005), vessel Owners had commenced arbitration against Plaintiff Charterer and Plaintiff, in turn, commenced arbitration against Defendant Sub-Charterer. The **only act** undertaken by vessel Owners against Plaintiff was the

provision of documentary evidence in support of its claim. On the existence of those facts alone,

Judge Buchwald denied Defendant's Motion to vacate the attachment:

> Thus, this case is distinguishable from *Greenwich Marine* . . ., relied on by
> [Defendant], ***because in that case there was little indication that the damage claim
> would actually be passed through a chain of charter parties and asserted against
> the Plaintiff***. After reviewing the record, we find that it is not unduly speculative to
> assume that the physical damage claims are being asserted down the chain of charter
> parties and that Plaintiff has a reasonable belief that it faces potential liability
> totaling $350,000 for those damages. We therefore find it appropriate to include this
> claim in the total amount that Plaintiff is entitled to attach as security.

2005 U.S. Dist. LEXIS 22409, *8.

Equally supporting San Juan's argument here is Judge Chin's decision in *Eitzen Sealift*

*A.S. v. Cementos Andinos Dominicanos, S.A.*, 05-4550, 2005 U.S. Dist. LEXIS 19876 (S.D.N.Y.

Sept. 9, 2005). In *Eitzen*, Plaintiff obtained a Rule B attachment order to secure, *inter alia*, an

indemnity claim from the beneficial owner and time charterer of the vessel stemming from the

grounding of the vessel (the hull claim) and an indemnity cargo claim from a third party. Judge

Chin allowed the attachment to be maintained to secure the hull claim that had been asserted

down the chain of charter parties, from the beneficial owner to time charterer to Plaintiff, even

though no arbitration proceeding had been commenced against the Plaintiff by either the

beneficial owner or the time charterer. 2005 U.S. Dist. LEXIS 19876, *3-8. Further, Judge Chin

also permitted the attachment to remain in respect of the cargo claim on the basis that the third

party had initiated proceedings against the Plaintiff. 2005 U.S. Dist. LEXIS 19876, *9-10.[3]

By contrast, Judges in this district have not ignored the prematurity of an indemnity claim

when it has been clear on the record that no proceeding (in a court of law or arbitration) had even

---

[3] Judge Chin only vacated that portion of the attachment that involved the costs and fees associated with the London arbitration in respect of the hull claim because no such arbitration proceedings had yet commenced and it was likely that no such proceeding would begin if New York arbitrators decided that the hull claim should be litigated in the New York arbitration by all the parties involved in the dispute. Hence, those costs were too remote and speculative.

been commenced against the Rule B plaintiff, *i.e.* such a failure demonstrating that the indemnity claim was speculative. *J.K. Int'l Pty. Ltd v. Agriko S.A.S.*, No. 06-13259, 2007 U.S. LEXIS 10074, *15-16 (S.D.N.Y. Feb. 13, 2007) ("[t]here is nothing in the record . . . to suggest that a lawsuit against Plaintiff, for which Plaintiff can then sue Defendant for indemnity, is on the horizon"). Similarly, in *Bottiglieri*, there was no ship arrest or the posting of security by the Rule B plaintiff in respect of the indemnity claim. 472 F. Supp. 2d at 591. Moreover, even though the parties' arbitrations had been commenced years before the filing of the Rule B action, Judge Kaplan commented that "the arbitrations have not progressed much over the years;" in fact, no formal submissions had even been served by the parties despite the passage of time. 472 F. Supp. 2d at 589, .n. 8. No such facts are present in this case, as the arbitrations have recently commenced, *i.e.* February 29, 2008. (Hopkins Decl., ¶).

Equally misplaced is Trans Power's reliance upon *Sonito Shipping*. As stated in footnote 2 above, that case was based on an interpretation of the ICA which expressly delineates when a cargo indemnity claim accrues. The ICA is not a part of the charter party between San Juan and Trans Power and none of the claims being asserted by San Juan against Trans Power are governed by the ICA. Moreover, as the *Navalmar* decision demonstrates, once the plaintiff has provided security in favor of the third party (as is the case with San Juan in the instant matter), the attachment is permitted in respect of what would otherwise be a contingent indemnity claim.

In sum, it would be inequitable and contrary to this Court's exercise of discretion to allow Trans Power to vacate or reduce a Rule B attachment that is procedurally sound on the ground that San Juan's liability to Hanjin and/or Head Owners is "contingent" and "speculative", when (1) Hanjin has already commenced arbitration proceedings against San Juan; (2) Hanjin will provide security in the sum of $3.8 million to Head Owners; and (3) San Juan will provide

security to Hanjin in the sum of $3.9 million. Thus, even if this Court were to find that the crane

and hull damage claims are indemnity claims (which is denied), San Juan respectfully requests

that this Court exercise its discretion and ignore the prematurity of those claims. The

attachments should accordingly be maintained.

## POINT IV

### TRANS POWER CANNOT BE FOUND IN THE DISTRICT FOR PURPOSES OF THE SECOND AMENDED VERIFIED COMPLAINT

In an attempt to preclude San Juan from obtaining a supplemental Process of Maritime

Attachment and Garnishment (PMAG) on the basis of its Second Amended Verified Complaint,

filed with the Court on March 28, 2008, Trans Power registered to do business in New York

State on February 19, 2008 and appointed its New York City counsel, Blanke Rome, as its

authorized agent for service. Trans Power contends that these acts establish that it is now

"found" in the District for purposes of a Rule B attachment action. Accordingly, Trans Power

argues that this Court may not issue a supplemental PMAG. This contention is without merit.


### A. The Amendments Relate Back to the Date of the Originally Filed Complaint

Rule 15(c)(2) of the Federal Rules of Civil Procedure unambiguously prescribes that:

(c) **Relation Back of Amendments**. An amendment of a pleading relates back to
the date of the original pleading when

\* \* \*

(2) the claim or defense asserted in the amended pleading arose out of the
conduct, transaction or occurrence set forth or attempted to be set forth in the
original pleading.

F.R.Civ.P. 15(c)(2). By the Rule's clear language, as long as the amendments to a complaint arise out of the "same transaction, or occurrence" identified in the original complaint, the amendments will be deemed to have been asserted as of the date of that original pleading.

San Juan filed its Verified Complaint on February 14, 2008 seeking security, in the sum of $1,213,505 (excluding interest and costs) for damages sustained by San Juan at the loading port of Waigeo, Indonesia stemming from breaches by Trans Power of the voyage charter party with San Juan. A day later, Plaintiff amended its complaint to raise the quantum of damages from $1.2 million to $1,474,054.53. Similarly, the amendments contained in the Second Amended Verified Complaint, filed on March 28, 2008, merely increased the quantum of damages sustained by San Juan at the loading port of Waigeo resulting from Trans Power's breaches of the voyage charter party. The Second Amended Verified Complaint now seeks security, in the sum of $3,409,913.54 (excluding interest and costs) for the same contractual breaches originally pled in February 14, 2008. There cannot be any doubt, therefore, that the claims in the Second Amended Verified Complaint arose out of the same "conduct, transaction or occurrence set forth" in the original pleading, namely, the acts and/or omissions of Trans Power and/or its agents at the port of Waigeo. Hence, as the amendments relate back to the original date of the complaint, Trans Power's post-attachment jurisdictional gamesmanship has no impact whatsoever on this Court's authority to issue a supplemental PMAG. *Constr. Exp. Enterps., Uneca v. Nikki Maritime Ltd.*, 558 F. Supp. 1372, 1375 (S.D.N.Y. 1984); *Heidmar Inc. v. Anonima Ravennate di Armamento Spa of Ravenna*, 132 F. 3d 264, 268 (5th 1998); *Caribbean Yacht Works, Ltd. v. NEENAH Z*, 410 F. Supp. 2d 1261 (S.D.Fla. 2005).

In *Nikki Maritime*, Judge Brieant held that amendments to a complaint within the context of a Rule B attachment application related back to the date of the filing of the original complaint.

In *Nikki Maritime*, the plaintiff initially brought an application for attachment under New York

State law because it erroneously believed that the defendant was found in New York City at the

time it filed the application on November 22, 1982. Following denial of the application and

during oral argument before the Second Circuit, plaintiff's counsel obtained facts demonstrating

that a "traditional admiralty attachment" may have been available. It appeared that on May 18,

1982, to avoid the impact of the Cuban sanctions regulations, the defendant had transferred its

operations from New York to Greece. The Second Circuit remanded the case to the district court

with instructions to determine whether the plaintiff was entitled to a Rule B attachment. On

remand, Plaintiff amended its complaint to essentially assert that the defendant could not be

found in the District and sought a Rule B order of attachment challenged by the defendant who

had already filed a general appearance. In granting the application Judge Brieant stated:

> Although plaintiff believed when it filed its initial complaint and first sought a
> state law attachment that Nikki was actually present in New York, the Court
> believes it may treat Nikki as being not present or found within the district at all
> times after May 18th, when it transferred its presence to Piraeus, Greece, for the
> obvious purpose of facilitating a profitable transaction which could not be
> performed lawfully from New York . . . . Presence in the district at times prior to
> May 18, 1982 will not defeat the right to an attachment to be determined here as
> of *November 22, 1982 when the original complaint was filed, to which date the
> amended complaint relates back*.

558 F. Supp. at 1375 (emphasis supplied; citations omitted).

Similarly, in *Heidmar*, plaintiff filed a Rule C arrest complaint against the vessel. Within

fifteen minutes of the filing of the complaint, the shipowner appointed an agent for service of

process in the Southern District of Texas. A week after the vessel's arrest, the shipowner proved

that the arrest was wrongful because plaintiff did not have a valid maritime lien against the

vessel under English law. The court, however, converted the Rule C arrest into a Rule B

attachment and requested briefing on the issue of whether the defendant could be found in the

district for purposes of the Rule B attachment. The court determined that the defendant was found in the district and vacated the attachment and plaintiff appealed. One of the issues on appeal was whether the defendant was present in the district at the time the lower court converted the Rule C action into a Rule B action. In reversing, the Fifth Circuit held that the conversion of the Rule C arrest to a Rule B attachment **related back to the original filing** of the complaint and accordingly, the defendant at that time was not found in the district. 132 F.3d at 268. *See also Caribbean Yachts*, 410 F. Supp. 2d at 1266, n.4 (observing that the conversion criterion is "consistent with Rule 15(c)(3) of the Federal Rules of Civil Procedure which allows an amendment changing the party to relate back to the date of the original complaint where, as here, the claim asserted 'arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading'").

Further buttressing San Juan's position that the amendments flow from the "same conduct, transaction or occurrence" is that fact that San Juan, in its original pleading, expressly reserved its right to increase its damages. (See Paragraph 18 of the Amended Verified Complaint). This explicit reservation was made because San Juan expected to incur additional losses relating to the vessel damages but, in order to avoid abusing the Rule B mechanism, it preferred to assert only those damages that could be reasonably ascertained at the time of the filing of the Rule B attachment application. *See World Reach Shipping Ltd. v. Industrial Carriers, Inc.*, No. 06-3756, 2006 U.S. Dist. LEXIS 83224, *6 (S.D.N.Y. Nov. 9, 2006) ("It is common for parties to learn of new information or new claims in maritime case after the lawsuit is filed").

Accordingly, since the amendments contained in the Second Amended Verified Complaint relate back to the date of the original pleading, *i.e.* at a time when it is not disputed

Trans Power was not "found in the District," Trans Power's argument that a supplemental

PMAG cannot issue because it is now present in the district must fail.[4]

## B. Trans Power Has Created an Illusory Presence in the District

It is clear that the sole purpose behind Trans Power's registration with the New York

State Department of State and appointment of its New York counsel as agent for service **after**

San Juan had commenced its Rule B action is to defeat future attachments by San Juan. Indeed,

precisely because this practice would undermine the very purpose of Rule B, courts invariably

hold that the defendant's presence in the district is determined as of the time the initial complaint

is filed. *Nikki Maritime Ltd.*, 558 F. Supp. at 1375. San Juan respectfully submits that Trans

Power's attempt to create an illusory presence in the district fails under the applicable law.

Trans Power concedes that there is a split of authority concerning the issue of whether the

mere registration with the NYS Department of State is sufficient to create presence within the

District for purposes of Rule B's personal jurisdiction requirement.[5] *See Erne Shipping, Inc. v.*

*HBC Hamburg Bulk Carriers GmbH*, 409 F. Supp. 2d 427 (S.D.N.Y. 2006). There, the court

held that, in denying defendant's motion to vacate, a certificate authorizing a defendant to do

business in New York was insufficient to create the jurisdictional presence required under Rule

B. The defendant, like Trans Power here, had registered to do business in New York and had

appointed this firm as its authorized agent of service. The Court, however, found that defendant

---

[4] As the Second Amended Verified Complaint related back to the filing of the original complaint in February 14, 2008, there was no requirement that San Juan submit a Supplemental Affidavit demonstrating that Trans Power could not be found in the District. Further, the Second Amended Verified Complaint stated that "Defense counsel advises that Trans Power has recently registered as doing business in New York, appointing CSC and Blank Rome LLP as agents for service, but Plaintiff avers that such action alone is not sufficient to render Trans Power "found" within the district." (Molina Aff., Ex. C).

[5] Trans Power correctly notes that there is a two-prong test used by courts to determine whether a defendant may be found in the District, namely, (1) whether the defendant can be found in terms of *in personam* jurisdiction; and (2) if so, whether the defendant can be found for service of process.

had no offices, no employees, no phone listings, no property located in the State of New York

and had done no advertising. Essentially, defendant's presence in the district was artificial.

To determine whether defendant's presence was sufficient to defeat the Rule B

attachment, the court examined the underlying policies behind maritime attachments, namely, to

provide security for the plaintiff if a suit is successful and (2) to assure the defendant's

appearance. In the court's view, registration to do business without more undermined those

twin-goals:

> First, a mere filing for authorization to do business proves no security to plaintiff.
> While we recognize that a rule requiring actual presence in the district (rather than
> just consent) also does not necessarily provide security, at least actual presence
> makes it far more likely that assets might be located in the district to levy upon
> should the suit be successful. A voluntary filing under the Business Corporation
> Law, by contrast, has little or no correlation with the presence of assets. Second,
> with respect to assuring the defendant's appearance in the action, the mere act of
> filing provides no assurance that suit could be instituted  in the future since the
> authorization can be surrendered unilaterally at any time. Thus, if we granted
> vacatur and if [the defendant] thereafter withdrew its filing, [plaintiff] would have
> no means of obtaining jurisdiction over [the defendant] if it were ever necessary
> to bring suit against [defendant] – for example to enforce an arbitration award. In
> sum, neither policy underlying Rule B is vindicated by predicating jurisdiction on
> a mere filing for authorization to do business under the Business Corporation
> Law.

409 F. Supp. 2d at 438.

Like the defendant in *Erne Shipping*, Trans Power has no real presence in the district and

no assets that can be used to satisfy any eventual arbitration award entered against Trans Power

should the court vacate the attachment. Moreover, even the consent to be sued that mere

registration allows is illusory because Trans Power may easily withdraw its filing at any time,

especially if its motion to vacate is granted.

Finally, the decision cited by Trans Power in its brief is factually distinguishable and

does not validate Trans Power's post-attachment gamesmanship. *Centauri Shipping Ltd. v.*

*Western Bulk Carriers KS*, 528 F. Supp. 2d 186 (S.D.N.Y. 2007). In *Centauri Shipping*, the Rule

B defendant had registered to do business in New York in **2005** and the Rule B attachment

application was filed on **June 5, 2007**. Thus, the Rule B defendant in *Centauri Shipping* did not

engage in any effort to defeat the plaintiff's Rule B action. Here, it cannot be disputed that Trans

Power's post-attachment "presence" in the district is illusory and a sham created for the sole

purpose of avoiding the instant action.

Accordingly, for all the foregoing reasons, Trans Power's post-attachment acts may not

preclude this Court from issuing a supplemental PMAG on the basis of San Juan's Second

Amended Verified Complaint.

### POINT V

### TRANS POWER'S CLAIM FOR COSTS OF DEFENDING THE ARBITRATION COMMENCED BY SAN JUAN IS NOT A COUNTERCLAIM WITHIN THE PURVIEW OF RULE E(7)

Trans Power has not asserted a counterclaim against San Juan. Rather, Trans Power

seeks countersecurity for the costs of defending the London arbitration commenced by San Juan.

As it is clear from the language of Rule E(7) and the applicable jurisprudence interpreting the

Rule, a request for countersecurity that it is not based upon a "counterclaim that arises from the

transaction or occurrence that is the subject of the original action" is improper. Importantly, a

day after Trans Power filed its memorandum of law in this case, this Court rejected the very

same argument advanced by Trans Power in another action. *Med-Asia Shipping Ltd. v. Cosco*

*Beijing Int'l Freight Co., Ltd.*, No. 07-9624, (S.D.N.Y. April 2, 2008). (Molina Aff., Ex. D). As

a result, San Juan respectfully requests that, on the basis of the *Med-Asia* decision and the legal

authorities relied therein, Trans Power's application for countersecurity be denied.[6]

---

[6] Given this Court's decision in *Med-Asia*, Trans Power should voluntarily withdraw its application in its Reply.

## **CONCLUSION**

For all the foregoing reasons, San Juan respectfully requests that this Court deny Trans

Power's Motion and allow the challenged attachments to remain fully in place, and award such

other and further relief as the Court may deem just and proper.

Dated: New York, New York
      April 18, 2008

FREEHILL, HOGAN & MAHAR LLP
Attorneys for Plaintiff
SAN JUAN NAVIGATION (SINGAPORE) PTE. LTD.

By: _Manuel A. Molina_

Eric E. Lenck (EL 4547)
Manuel A. Molina (MM 1017)
80 Pine Street
New York, New York  10005
(212) 425-1900

TO:   BLANK ROME, LLP
      Attorneys for Defendants
      405 Lexington Avenue
      New York, N.Y. 10174

      Attn: Jeremy J.O. Harwood, Esq,
      (212) 885-5000